265 N.J. Super. 6 (1993)
625 A.2d 527
H. IAN WACHSTEIN, PLAINTIFF-APPELLANT-CROSS-RESPONDENT,
v.
ALFRED A. SLOCUM, IN HIS CAPACITY AS PUBLIC ADVOCATE AND INDIVIDUALLY AND THE DEPARTMENT OF THE PUBLIC ADVOCATE, DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 20, 1993.
Decided May 26, 1993.
*9 Before Judges ANTELL, DREIER and SKILLMAN.
Malachi J. Kenney argued the cause for appellant-cross-respondent (Kenney, Gross & McDonough, attorneys; Mr. Kenney, of counsel; Mary F. Hartnett, on the brief).
Benjamin Clarke, Assistant Attorney General, argued the cause for respondents-cross-appellants (Robert J. Del Tufo, Attorney General, attorney; Mary C. Jacobson, Senior Deputy Attorney General, of counsel; Mr. Clarke, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
In August 1985, defendant Alfred A. Slocum was nominated by Governor Thomas Kean and confirmed by the New Jersey Senate as the New Jersey Public Advocate, a position in the Governor's cabinet. N.J.S.A. 52:27E-2, 3. Approximately a year later, in August 1986, Slocum also was appointed Public Defender  a sub-cabinet position within the Department of the Public Advocate  which is the head of the office with responsibility for providing legal representation to indigent criminal defendants. N.J.S.A. 2A:158A-3 to 5. Slocum told the Governor that he planned to make "dramatic managerial personnel changes" in the Office of Public Defender, and the Governor agreed to such changes.
This case involves the managerial changes that Slocum made in the position of Regional Public Defender, which supervises a regional office of the Public Defender. There were nineteen of these positions when Slocum took office, all of which were occupied by white males. Seven of the Regional Public Defenders *10 were "prime timers," which meant that they were allowed to engage in the private practice of law outside of normal working hours. Slocum determined that all Public Defenders should serve full-time and issued a directive to that effect shortly after taking office. As a result, five of the nineteen Regional Public Defenders resigned. Slocum also determined that there should be a Regional Public Defender in each county and thus increased the number of these positions from nineteen to twenty-one.
Slocum conducted evaluations of the fourteen remaining incumbents in Regional Public Defender positions. These evaluations consisted of visiting each of the regional offices and obtaining the views of the Chief Investigator of the Public Defender's office and other members of Slocum's staff in Trenton who had regular contact with the regional offices. Slocum also had a discussion with former Public Advocate Stanley Van Ness.
After completing these evaluations, Slocum determined to remove three of the remaining Regional Public Defenders and to assign them to non-supervisory positions. In addition, Slocum demoted two Assistant Public Defenders and transferred the Regional Public Defender in Hudson County to the same position in Essex County. One of the Regional Public Defenders whom Slocum demoted was plaintiff, H. Ian Wachstein, who had been in charge of the Camden office of the Public Defender since 1972. Upon his removal from the position of Regional Public Defender, plaintiff was assigned to the Office of Law Guardian in the Camden office of the Public Defender. Law Guardians are assigned to represent minors in cases of alleged child abuse or neglect. See N.J.S.A. 9:6-8.21(d).
According to Slocum, the reason he removed plaintiff from his managerial position was that he was too "laid back." Slocum said he received information that plaintiff frequently did not arrive at the Public Defender's office until late morning and that he also left early. Slocum also said he was informed that plaintiff and other members of his staff came to work in blue jeans and polo shirts. *11 In addition, Mr. Van Ness told him that if he were still the Public Defender, he would remove plaintiff.
The resignation of five "prime time" Regional Public Defenders, the demotion of three others including plaintiff and the creation of two new positions, resulted in a total of ten vacancies in the position of Regional Public Defender. Slocum filled four of these positions with white males, four with white females and two with black males. One of the positions filled by a black male was in Camden County. After all of these management changes were completed, the Regional Public Defender positions were filled by fifteen white males, four white females and two black males.
In April 1987, plaintiff filed this lawsuit alleging that Slocum and the Department of Public Advocate had discriminated on the basis of race in removing him from the position of Regional Public Defender. Plaintiff also alleged that defendants had discriminated against him on the basis of age (he was 46 at the time) and religion (he is Jewish). Plaintiff further alleged that his salary had been decreased from $56,351.55 to $54,339.37 subsequent to his demotion in retaliation for his wife sending a letter to the Governor complaining about Slocum's action. Plaintiff's claims were based on the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42, and Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000e-17.
During the pendency of this suit, Slocum directed that plaintiff be transferred to a position outside of Camden County. As a result, plaintiff was assigned to the Atlantic County office of the Public Defender. Plaintiff subsequently filed an amended complaint alleging that Slocum had him transferred in retaliation for his pursuit of this litigation.
The case was tried over four days. Plaintiff's claim that his removal from the position of Regional Public Defender was racially motivated was based on evidence that (1) plaintiff had always received satisfactory performance evaluations, (2) Slocum made a statement during a meeting with the Regional Public Defenders that he considered it undesirable for all nineteen persons in this *12 position to be white males and that he planned to change this racial composition during his tenure, (3) in response to a letter from the President of the Monmouth County Bar Association complaining about Slocum's appointment of a female attorney from outside the county to be the Regional Public Defender in Monmouth County, Slocum had written a letter which stated that there was "a dirth [sic] of female, black and minority" Deputy Public Defenders and that "I have taken upon myself as a primary responsibility the duty to affirmatively compensate for the dirth [sic] of female employees serving in this capacity" and (4) the person who took plaintiff's place as Regional Public Defender in the Camden office was black.
At the close of plaintiff's case, the trial court granted defendants' motion to dismiss plaintiff's retaliation claim based on the decrease in his salary after his wife sent a letter to the Governor complaining about his demotion. However, the court denied defendants' motion to dismiss plaintiff's other claims. As to plaintiff's race discrimination claim, the court stated:
Clearly, there is direct evidence here that the Defendant had a goal to increase minority representation, and that the audience to whom he addressed his first statement was an all white male audience, and the Jury can find from that that there was discrimination.... It was stated that there would be a replacement of white men with either women or other men of minority groups. That is sufficient to satisfy that prong of the prescription of this claim.
The jury returned a verdict in plaintiff's favor on his claims that his removal from the position of Regional Public Defender was racially discriminatory and that his transfer from Camden County to Atlantic County was ordered in retaliation for his pursuit of this lawsuit. The jury rejected plaintiff's claims of discrimination on the basis of age and religion. The jury awarded plaintiff $80,000 in compensatory damages and $16 in punitive damages.
After the return of the jury verdict, plaintiff filed a motion for judgment n.o.v. with regard to damages or, in the alternative, a new trial on damages. In addition, plaintiff argued that the trial court had erred in dismissing his retaliation claim based on the reduction of his salary subsequent to his wife's letter to the *13 Governor. Plaintiff requested the court to "add a reasonable amount of punitive damages" or, in the alternative, grant a new trial as to this claim. Defendants filed a motion for judgment n.o.v. or, in the alternative, a new trial as to liability. The trial court denied both plaintiff's and defendants' post-trial motions in their entirety.
Plaintiff appeals from the trial court's denial of his motion for a new trial as to damages and from the dismissal of his retaliation claim based on the decrease in his salary after his wife's letter to the Governor, and defendants cross-appeal from the court's denial of their motion for a judgment n.o.v.
We conclude that the evidence presented at trial was insufficient to support a jury finding that defendants discriminated on the basis of race in removing plaintiff from the position of Regional Public Defender. We also conclude that the trial court correctly dismissed plaintiff's claim that his salary was reduced in retaliation for his wife's letter to the Governor. However, plaintiff presented sufficient evidence to support the jury's finding that he was transferred out of the Camden County office of the Public Defender in retaliation for his pursuit of this lawsuit. Since the jury's damage award was based in part on its finding that plaintiff's removal from the position of Regional Public Defender was racially discriminatory, the judgment is reversed and the case is remanded for a new trial limited to the issue of damages resulting from plaintiff's transfer from Camden to Atlantic County.

I
This is a reverse discrimination case; that is, it involves a claim by a white male that he was discriminated against on account of his race. In Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 569 A.2d 793 (1990), the Court held that such a claim should be decided under a different set of rules than those applicable to discrimination claims by a member of a minority group. The Court noted that "... when a complainant is a *14 member of the majority and not representative of persons usually discriminated against in the work place, discrimination directed against that person is `unusual.'" Id. at 552, 569 A.2d 793. Thus, "[i]n reverse discrimination cases, the rationale supporting the rebuttable presumption of discrimination embodied in the prima facie elements does not apply." Id. at 551, 569 A.2d 793.
Since the trial court concluded that plaintiff established a prima facie case and required defendants to present their proofs, we proceed directly to the question whether on the entire record a rational trier of fact could find that defendants' removal of plaintiff was racially motivated. See United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403, 410 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.").
The threshold question on this appeal is whether defendants' removal of plaintiff from the position of Regional Public Defender and the appointment of a black person to that position should be viewed in isolation from defendants' other management decisions made at or about the same time. Slocum gave undisputed testimony that he decided even before accepting the position of Public Defender that significant changes should be made in the management of the office because he perceived it to be "stagnant" and to need a "breath" of "new life." It also is undisputed that to that end Slocum eliminated the "prime time" Public Defender positions and undertook an evaluation of all persons occupying the management positions of Assistant Public Defender and Regional Public Defender. The record leaves no doubt that plaintiff's removal from his position resulted from this management reorganization process.
Viewed in this broader context, there is no basis in the record for a finding that plaintiff's removal from his management position was racially motivated. Initially, we note the obvious point that since all the Regional Public Defenders were white males, the only *15 way Slocum could remove any current occupants of this position was to remove white males. Secondly, we note that Slocum's elimination of the "prime time" Public Defender position and his creation of two additional Regional Public Defender positions resulted in seven vacancies. Thus, Slocum's expressed goal of increasing the number of minorities and women in management positions, which he subsequently implemented by appointing two black males and four white females as Regional Public Defenders, could have been accomplished without involuntarily removing anyone. Therefore, absent other evidence of discriminatory motive, the race of the three persons removed from the position of Regional Public Defender and the races and sexes of the ten persons appointed to fill the vacancies does not provide an adequate foundation for an inference that plaintiff's removal was the product of racial discrimination.
Plaintiff contends that such other evidence may be found in Slocum's comments at a meeting with Public Defenders and in a letter he sent to the President of the Monmouth County Bar Association responding to a complaint about his appointment of a woman from outside of Monmouth County to be the Regional Public Defender in that county. Plaintiff's version of Slocum's comments at the meeting with the Regional Public Defenders was as follows:
Q. All right. Now, when did you first have occasion to meet Mr. Slocum after he became your boss?
A. Mr. Slocum called for a meeting in, I believe, it was August of 1986 of the deputies throughout the State and we all gathered in Trenton.
....
Q. Okay. And did anything occur at that meeting of note?
A. Well, the one thing that remains vivid in my mind is the comment that the commissioner  the Public Defender made during the meeting to the effect, he actually almost started out the meeting by saying that he had heard rumors about himself.
That he was prepared to change all of the white deputies into black deputies. And then he waited a moment for that to sink in.
And then he said, to his knowledge he was unaware of any scientific  and I paraphrase  but any scientific method to do that. And so he didn't see that happening.

*16 And obviously, there was a silence in the room. I was aware that it was intended to appear like it was a joke.
Q. Why do you say that? That it was intended to appear as a joke? Was it a joke or wasn't it a joke?
A. Well, I'm not quite sure whether it was or not.
Q. Did you respond to it as if it were a joke?
A. I was  I was concerned. I didn't know Mr. Slocum. I didn't know what he was going to be doing. But I was a little bit concerned.
Q. Did any of your colleagues in the room laugh as if it were a joke?
A. I don't think anybody laughed. I don't think there was a response. I think there was silence.
Slocum's version of his comments was similar:
Q.... [Y]ou remember you had a meeting with your Deputies shortly after you took office?
A. Yes, I did.
Q. Do you recall what you told them?
A. Yes, I recall the substance of the meeting. I had the desire to tell them about my notion of prime time, I also had the desire to tell them that I was aware of the fact that there was an issue as to the complexion of the Deputies, and I did make a mention of the fact that they were all white males, I did tell them that. There were rumors abound as to what would take place as a consequence of my tenure in office, and I thought that it was appropriate for me to put those rumors to bed, and that I did tell them. Unfortunately, the nature of rumors are such that there is always some seed which gives credibility to the rumor, and I said, I understand that there have been rumors that I intend to make every Deputy black. I said, there is no such truth to that rumor. However, I do see when I look out before me that everyone is a white male, and it's very clear to me, I said, that I don't know what system produced such a result, but that result would not indure [sic] during my tenure, because I contended you had to have been discriminatory in the past to create such a result, and I was also aware of the fact that the Department had been sued, we had been sued by a woman, that there was a settlement in that case, we had been sued for gender discrimination, and that as a part of the settlement we were to be monitored, and we were to make every attempt to infuse women into managerial roles, I was aware of that, and I knew that I intended to do that.
The pertinent part of Slocum's letter to the President of the Monmouth County Bar Association stated:
[W]ithin the ranks of the PD there exists a dirth [sic] of female, black and minority Deputies. Whatever methodology was employed to identify and place into office high caliber individuals to serve as deputies, those methods ostensibly discriminated against female, blacks and minority employees. In this instance, I have taken upon myself as a primary responsibility the duty to affirmatively compensate for the dirth [sic] of female employees serving in this capacity. It is *17 to be noted that the Public Defender's office in Monmouth County enjoys the services of two female attorneys and no black attorneys. In my judgment, it is important that the PD, unfettered by notions of politics, address these concerns in a forthright manner, promote from within its own ranks, and do so as a consequence of merit and overall equanimity.
We do not believe a trier of fact could reasonably find from Slocum's comments to the Public Defenders or his letter to the President of the Monmouth County Bar Association that his personnel actions had been or would be racially discriminatory. We do not consider it unusual or improper for a high level public official to indicate that it is undesirable for all nineteen positions in a particular supervisory title to be occupied by white males and to state that he intends to take appropriate steps to correct this imbalance. Slocum was understandably concerned that the racial and sexual composition of the position of Regional Public Defender might have resulted from past discrimination and that his Department was vulnerable to discrimination claims by minorities and females. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668, 679 (1973); Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 32, 429 A.2d 341 (1981). Indeed, the Department of Public Advocate had been sued for sex discrimination prior to Slocum's appointment, which had resulted in entry of a consent decree requiring among other things that the Department "hire and promote women in such a manner that by July 2, 1988, the percentage of women attorneys employed by the Public Advocate shall be equal to the average percentage of women graduates receiving degrees from New Jersey law schools during the period 1983 to 1988."[1] Moreover, even if the Department had never discriminated in the past, Slocum could properly pursue an affirmative action policy of increasing the number of females and minorities in supervisory positions, provided that policy was implemented in a manner consistent with discrimination laws. See N.J.S.A. 11A:7-1 to 13 (requiring all State agencies to *18 develop, implement and administer affirmative action programs); United Steelworkers of America v. Weber, 443 U.S. 193, 208, 99 S.Ct. 2721, 2729-30, 61 L.Ed.2d 480, 492 (1979) (upholding affirmative action plan that did not serve as an "absolute bar to the advancement of white employees"); see also Johnson v. Transportation Agency, Santa Clara County, 770 F.2d 752 (9th Cir.1985), aff'd 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). If an employer's statements that he planned to combat discrimination and to pursue affirmative action goals were held to be an adequate basis for a finding of discrimination against a white employee, anti-discrimination laws would be turned on their head and transformed into a device for preservation of the racial status quo in the workforce.
Moreover, plaintiff presented no other evidence which would support a finding that Slocum removed him because of his race. Instead, plaintiff's other proofs only tended to show that Slocum's evaluation of the persons who occupied the Regional Public Defender position was less rigorous than it could have been. Thus, plaintiff showed that while Slocum met with former Public Defender Van Ness to discuss management staff, he did not meet with his immediate predecessor, Joseph Rodriguez. Similarly, Slocum did not discuss the performance of the Camden Public Defender's office with any of the judges or court administrators in Camden County or with the First Assistant Public Defender. Plaintiff also presented evidence that the Chief Investigator's evaluation of plaintiff upon which Slocum relied may have been influenced by personality and/or policy conflicts within the Public Defender's office. In addition, plaintiff presented evidence that Slocum failed to make sufficient efforts to verify certain of the negative information which he received regarding plaintiff, such as plaintiff's work hours. Although one could conclude from this evidence that Slocum assigned undue weight to his own subjective impression of plaintiff's "management style," which Slocum considered too "laid back," this method of evaluation did not violate the anti-discrimination laws or other statutory provisions. Deputy Public Defenders serve solely "at the pleasure" of the Public Defender, N.J.S.A. *19 2A:158-6. Therefore, Slocum was entitled to retain in supervisory positions only those persons who he believed could perform their responsibilities in accordance with his conception of proper management style. We find no evidence in this record from which a rational trier of fact could find that Slocum, as part of his overall reorganization of the management structure of the Office of Public Defender, discriminated on the basis of race in removing plaintiff from his position of Regional Public Defender.

II
We turn next to plaintiff's appeal from the trial court's dismissal of his claim that his post-demotion salary reduction from $56,351.55 to $54,339.37 was in retaliation for his wife's letter to the Governor protesting his demotion. To establish a prima facie case of retaliation it must be shown that "(1) claimant engaged in a protected activity known to the employer, (2) claimant thereafter was subjected to adverse employment decision by the employer, and (3) there was a causal link between the two." Jamison v. Rockaway Township Bd. of Educ., 242 N.J. Super. 436, 445, 577 A.2d 177 (App.Div. 1990). The letter from plaintiff's wife to the Governor satisfied the first prong of a prima facie case of retaliation. However, the trial court correctly concluded that plaintiff failed to establish the second and third prerequisites.
The letter from plaintiff's wife to the Governor is undated and plaintiff failed to present any evidence as to when the letter was sent or received. Although the Governor's response to that letter, dated February 27, 1987, states that he had discussed the letter with Slocum, plaintiff did not present any evidence that the administrative action to reduce his salary was taken after that date or that Slocum was in any way involved in this action. To the contrary, the testimony of plaintiff's witness, First Assistant Public Defender Smith, suggested that the salary reduction was put in motion well before Slocum could have learned of the letter. Smith explained that plaintiff's personnel card has two notations for January 3, 1987, one noting the salary and position change to *20 $56,351.55, and the second noting a further salary reduction to $54,339.37 due to an administrative error. Smith also explained that the rationale for plaintiff's salary reduction was to place him at the same salary level as one of the other demoted Regional Public Defenders whose pre-demotion salary had been the same as plaintiff's. Moreover, neither Smith's testimony nor any of plaintiff's other evidence indicated that Slocum was involved in the administrative process which resulted in this adjustment in plaintiff's salary.

III
Defendants' appellate brief does not dispute that plaintiff presented sufficient evidence from which the jury could find that his transfer from Camden to Atlantic County was in retaliation for this lawsuit. Defendants' only argument relating to the jury verdict on this retaliation claim is that a new trial is required because plaintiff's counsel improperly argued to the jury that it should draw an adverse inference from the fact that Slocum was represented by two attorneys.[2]
Slocum was represented by both a Deputy Attorney General and personal attorney because of the possible conflict of interest which exists when a State employee is sued for punitive damages. This conflict arises because the employee's right to indemnification for punitive damages is within the Attorney General's discretion and thus the employee may be personally responsible for such damages. To minimize the potential conflict problems raised by plaintiff's assertion of a punitive damages claim, Commissioner Slocum was represented by both a Deputy Attorney General and a "personal" attorney.
*21 Slocum's representation by personal counsel was first raised during Slocum's cross-examination. Slocum asserted on direct examination that he did not know when this lawsuit had been filed and suggested that he had only limited awareness of its status. On cross-examination, Slocum testified as follows:
Q. All right. Mr. Slocum, you testified yesterday that you really didn't keep aware of the progress of this lawsuit, and were not aware that in the spring of 1988 the law suit had been placed on the ready for trial list in Camden County, is that correct?
A. I wasn't aware of it, I get sued a lot and in my capacity as the Public Defender. I didn't see this at that time as being distinguishable from other suits, and I didn't spend a lot of time worrying about any of them.
Q. Uh-huh. And how many of those suits were you sued individually to the degree that you retained a personal attorney? Other than this one, of course?
A. Only this one.
Q. Only this one?
A. Only this one.
Q. So, this one was a little bit different?
A. It was different in that regard, yes.
Q. But you didn't 
A. This is the one that was in the newspapers.
Q. You didn't follow the progress of it?
A. Well, quite frankly, I wasn't aware of any progress. I know I was deposed, other people got deposed, I didn't appear at their depositions, they got deposed in it, and at some point my view was that whenever we ever get to go to trial, let me know, that's all I worried about, I was ready to come to trial, I looked forward to this day.
We perceive nothing improper about the cross-examination. The degree of Slocum's sensitivity to this lawsuit was directly relevant to plaintiff's claim that Slocum's reason for transferring him out of Camden County was retaliation.
In summation, plaintiff's counsel made the following argument to the jury regarding this retaliation claim:
We say there was absolutely no reason for moving Mr. Wachstein from Camden to Atlantic County requiring him to commute an hour each day rather than the five minutes it took him to get to his office in Camden.
....
We suggest the reason it happened was that Mr. Slocum was angry about having been sued and that anger was triggered by the fact that he was given notice that *22 the case was ready to go to trial in the spring of 1988 immediately before Mr. Wachstein was moved.
To what does Mr.  how does Mr. Slocum respond to that?
He says, first, he didn't know it was going to trial. Really? Sure, he gets sued all the time. This is routine. Doesn't pay any attention to it. Gets sued all the time.
And how many cases did you hire your own lawyer to represent you? Well, really just this one. This is the only one. Let's get real.
Who gets sued personally and doesn't pay any attention to it?
I know that cabinet officers are big and important people, but I respectfully submit that nobody's that big and important.
Not when you have to hire your own lawyer and can't simply rely on the State to represent you. It's a matter of concern and you keep track.
Simply put, common sense makes it impossible to believe the defendant when he says he didn't know the case was ready for trial.
In view of Slocum's testimony that he had only limited awareness and interest in this lawsuit, plaintiff's effort to attack his credibility by showing that he was represented by personal counsel was proper. Moreover, the trial court informed the jury that Slocum's dual representation had nothing to do with whether there was illegal discrimination or whether the jury should award compensatory or punitive damages. Therefore, plaintiff's cross-examination of Slocum and comments in summation regarding Slocum's dual representation do not provide a basis for granting defendants a new trial on plaintiff's retaliation claim.
In addition, although defendants have not contended that plaintiff's proofs were insufficient to support the jury's verdict on his retaliation claim arising out of his transfer to Atlantic County, we note our agreement with the trial court's comments in denying defendants' motion for judgment n.o.v. on this claim. Although Slocum alleged that it was his policy to transfer to another county any Public Defender demoted from a supervisory position, plaintiff himself was assigned to Camden County after his demotion. Moreover, according to plaintiff, Slocum never indicated that this assignment would be temporary. And although plaintiff received very positive evaluations in his new assignment, Slocum personally directed that he be transferred to a position outside of Camden County subsequent to the filing of this lawsuit. Slocum alleged *23 that his reasons for transferring plaintiff were that his continued presence in Camden County "would be conducive to factionalism in the office" and that he could not obtain a "real evaluation" of the plaintiff's performance from anyone in the Camden office. However, plaintiff's evidence showed that the office of Law Guardian was located on a different floor of the building than the rest of the Public Defender's office and that the Regional Public Defender in Camden County has no supervisory authority over the Law Guardian. Plaintiff's evidence also showed that he had a much closer personal relationship with the Regional Public Defender in Atlantic County, who was a law school classmate and later one of his subordinates in the Camden office, than with the Chief Law Guardian in Camden County. Therefore, the jury reasonably could have found that Slocum's professed reasons for transferring plaintiff to Atlantic County were pretextual and that his actual reason was retaliation for plaintiff's continued pursuit of this lawsuit.

IV
The jury returned a lump sum verdict in favor of plaintiff for $80,000 in compensatory damages, without allocating separate sums to plaintiff's racial discrimination and retaliation claims. Since we are reversing the judgment on plaintiff's racial discrimination claim, a new trial must be held limited to the issue of damages resulting from plaintiff's retaliatory transfer from Camden to Atlantic County.
In addition, Slocum is entitled to a new trial on punitive damages, since the jury verdict does not reveal whether those damages were awarded because of the racial discrimination found by the jury or the retaliatory transfer, or both. However, Slocum may accept the $16 punitive damages award since an award which the jury believed to be sufficient for acts of both racial discrimination and retaliation obviously would be sufficient for retaliation only.
*24 Plaintiff has raised one point which needs to be addressed for the guidance of the trial court at the retrial. The trial court instructed the jury that any damage award to plaintiff would not be taxable. This instruction was based on the Third Circuit Court of Appeals' decision in Rickel v. Commissioner of Internal Revenue, 900 F.2d 655 (3rd Cir.1990). However, subsequent to the trial, the Supreme Court of the United States apparently rejected the reasoning of Rickel in holding that back pay awards in Title VII cases are not excludable from gross income for federal income tax purposes. United States v. Burke, 504 U.S. ___, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992). It is unclear to us whether the reasoning of Burke relating to the taxability of an award of "back pay" under Title VII would extend to the damages sought by plaintiff for unlawful retaliation. See Lisec v. United Airlines, 10 Cal. App.4th 1500, 11 Cal. Rptr.2d 689 (1992). Given the present uncertainty of the law in this area, we believe the wisest course would be for the trial court to omit any reference to taxability in its instructions to the jury. Cf. Ruff v. Weintraub, 105 N.J. 233, 519 A.2d 1384 (1987); Bussell v. DeWalt Products Corp., 105 N.J. 223, 519 A.2d 1379 (1987).
Accordingly, we affirm the dismissal of plaintiff's retaliation claim based on the reduction in his salary. We affirm the judgment in plaintiff's favor on his retaliation claim based on his transfer to Atlantic County. We reverse the judgment for plaintiff on his claim of racial discrimination arising out of his demotion, and remand for a new trial limited to the damages resulting from the retaliatory transfer.
NOTES
[1] Although the consent decrees made no specific commitment to promote women to supervisory positions, one of the riders noted that women comprised 20.6% of the eligible candidates for supervisory positions.
[2] Defendants' brief does not specifically indicate whether this argument relates to the jury's finding of racial discrimination, unlawful retaliation, or both. However, the cross-examination of Slocum and comments of plaintiff's counsel at which this argument is directed related to plaintiff's claim of retaliation arising out of his transfer to Atlantic County. Therefore, we assume this argument challenges the jury verdict on this retaliation claim.