709 A.2d 340

WINFIELD B. MURRAY, PLAINTIFF, v. NEWARK
HOUSING AUTHORITY, DEFENDANT.

Superior Court of New Jersey
Law Division Essex County

Decided January 2, 1998.

Vito Carnevale for plaintiff (*Stern, Dubrow & Marcus*, attorneys).

*Karimu F. Hill–Harvey* for defendant (*Frank L. Armour*, General Counsel, Housing Authority of the City of Newark).

EDITH K. PAYNE, J.S.C.

Plaintiff Winfield Murray, who was employed provisionally by the Newark Housing Authority (NHA) from May 6, 1985 to August 6, 1993 as a boiler operator, filed suit under the *New Jersey Law Against Discrimination* (LAD), *N.J.S.A.* 10:5–1 to –42, claiming age discrimination in the NHA's decision to terminate his employment. At the time that his employment ceased, Mr. Murray, who was born on January 3, 1928, was 65 years of age.

Trial of plaintiff's case occurred before me on September 30 and October 1, 1997. For the reasons that follow, I find in plaintiff's favor, and I award damages as specified at the conclusion of this opinion.

## A. *Findings of Fact*

Testimony at trial revealed that on September 4 and October 2, 1992, the NHA informed its provisional boiler operators that the State Department of Personnel would be conducting a certification test, and that if the test were passed, a "possibility of acquiring permanency in your title" existed. Mr. Murray, along with others, took the test and, on January 27, 1993, he was informed that he had passed with a score of 90. Thereafter, the State furnished an initial ranking of those who passed the test and achieved a rank of 31 or better, entitled Notifications of Eligibility for Appointment to the Personnel Department of the NHA. Factors including status as a disabled veteran, as a veteran without disability and as a resident of Newark figured into the rankings. Mr. Murray, a non-veteran residing in Irvington, was not included in the State's initial list.

At the time that the test results were provided to the NHA, the Authority had twenty-seven permanent positions open for boiler operator. Under Civil Service rules, the NHA was required to fill those permanent positions from the list of qualified applicants furnished to it by the State. It did so, filling twenty-four permanent positions thereby. The remaining persons on the State's list either failed to attend a mandatory interview, failed to appear for a physical exam, expressed disinterest in a permanent position, or otherwise failed to meet the criteria established for the position. Because the NHA was required to pick as permanent employees only persons whose names appeared on the State's list,[1] the NHA

---

[1] A subsequent list, constituting the two additional pages of the State's eligible/failure roster, was furnished to the NHA after its decisions regarding permanent employment had been made. That list ranked the relevant remaining provisional employees in the following order:

was unable to fill the remaining three positions on a permanent basis, but was permitted to staff the positions with provisional employees.

In July, 1993, the NHA proceeded to fill the three remaining positions from a pool of six provisional employees remaining in the NHA's employ.[2]  Because of budgetary constraints, the other three employees were terminated.  Evidence discloses that the following three persons were retained:

| Name | Residence | Date of Hire | Age |
|------|-----------|--------------|-----|
| Grenell Sylvester | East Orange | 5/21/85 or 10/31/83 | 48 |
| James Parker | West Orange | 12/9/91 | 42 |
| Robert Rouse | Irvington | 12/9/86 | 57 |

The following three persons were terminated, effective August 6, 1993:

| Name | Residence | Date of Hire | Age |
|------|-----------|--------------|-----|
| Joseph Ellis | Newark | 5/6/91 | 58 |
| Winfield Murray | Irvington | 5/6/85 | 65 |
| Craig Herbert | Elizabeth | 1/8/90 | 30 |

Evidence was given by Larry Howell, the NHA's Assistant Personnel Officer, and Joseph Mennella, its Personnel Officer, as to the method and circumstances of the above selections.  Both

| Rank | Vet. Status | Name | Score |
|------|-------------|------|-------|
| 43 | Vet. | Robert Rouse | 90 |
| 47 | No | Winfield Murray | 90 |
| 47 | No | James Parker | 90 |
| 47 | No | Grenell Sylvester | 90 |
| 53 | No | Craig Herbert | 80 |

James Ellis, a provisional boiler operator who also was terminated, does not appear on the list.

[2] A seventh employee, Robert Reese, Jr. (age 24), applied for and was transferred to a lesser provisional position.  Plaintiff testified that he was never offered provisional employment in another job capacity.  However, he did not state that he applied for such a transfer.

testified that they were chosen to do the selection because they had no knowledge of the people at issue and thus could make a neutral choice. They testified that they did not consult personnel files in making their determination (although those files were within arm's reach), and that although the employees' immediate supervisor, Bishop Moore, was contacted,[3] he was not asked to comment on job performance or any other factor relevant to the NHA's termination decisions. At trial, both Howell and Mennella stated repeatedly that the selection was "random," and was not based on a review of any documents or on considerations of age, residence, date of hire, test scores, disciplinary record, or work performance. Significantly, however, neither mentioned random selection in deposition testimony introduced in court. Rather, Mr. Howell stated that he had no idea why one employee was terminated, whereas another was retained. Mr. Mennella stated that he did not recall how the selections were made.

Despite repeated and pointed questioning, neither Mr. Howell nor Mr. Mennella would disclose the manner in which the "random" selection had actually occurred. Both stated that selections were made from a list (P–5) that set forth the names of the relevant employees, interspersed with the names of non-relevant employees, in the following order:

| | |
|---|---|
| Joseph Ellis | (Terminated) |
| Winfield Murray | (Terminated) |
| Grenell Sylvester | (Retained) |
| James Parker | (Retained) |
| Robert Rouse | (Retained) |
| Craig Herbert | (Terminated) |

---

[3] Mr. Howell stated that Moore was at the meeting at which the employment decisions were made, but that he was not asked who should be chosen for continued employment, because that would have destroyed the neutrality of the process. Mr. Mennella stated that Moore was not present, but that Mennella contacted by him prior to the meeting solely to tell him that a random selection would be made.

However, they denied that the selection was made alphabetically,[4] was based on the employee's position on the list, was based on a "rule of three," on a choice of every other employee, or on a random drawing.

The testimony of Mr. Mennella, which I paraphrase, exemplifies the evidence provided regarding the method of selection.

Q Did you have P–5 available at the time you were making the termination decision?

A Yes.

Q You have testified that you made the decision randomly. How, precisely was that done?

A There is no provision in the Administrative Code that governs random selection.

Q Mechanically, how did you make the selection?

A We just selected three names.

Q Did you do it alphabetically? Place names in a hat? Choose every other one? Choose one in three? What was the method?

A We didn't do any one of those.

Q Then how was the selection made?

A I just don't recall. We just selected three names.

Mr. Howell and Mr. Mennella were the only witnesses called by the Newark Housing Authority to testify regarding the selection procedure, and their testimony was unilluminating. Nonetheless, the defense rested.

Because testimony had suggested that Bishop Moore and Wendell Wilson had also been present at the meeting at which the selection had taken place, and because both were still employed by the Authority, at the conclusion of the case, I notified counsel that I was considering a missing witness inference. Counsel for the Housing Authority thereupon requested leave to reopen the Authority's case to present the testimony of the two other alleged meeting participants. Leave was granted, and Bishop Moore, plaintiff's supervisor, and Wendell Wilson, the Housing Authority's Chief of Recruitment/Labor Relations, were produced as witnesses.

---

4 In fact, the three terminated employees have last names that alphabetically precede the three retained employees.

Mr. Moore denied that he had provided any input regarding the terminations. Mr. Wilson, like Mr. Mennella and Mr. Howell, testified that the selection had been made randomly from a list of employees. However, Mr. Wilson testified that the list was not the one identified by the other witnesses, because that list set forth employment determinations that had not been made prior to the meeting, and that the list utilized at the meeting had not been offered in evidence at trial. When asked whether the actual list utilized by the NHA had been organized alphabetically, by seniority or by other means, Mr. Wilson answered that it was "just a list" that had come from the personnel office. Like the other witnesses, Mr. Wilson denied that the selection had been based on scores, residence, work performance, age, or seniority, and he denied consulting personnel records, talking to the employees' supervisor, or discussing qualifications. However, he, too, was wholly unable to describe the process by which the random selection was made, stating only that the meeting attendees had to get rid of three employees and, when the selection had occurred, plaintiff's name was there. Mr. Wilson's testimony concluded as follows:

Q Can you provide any detail regarding the random selection?

A No.

Q That's all the information available that would help me to understand why plaintiff was terminated?

A That's correct.

## B. Conclusions of Law

The LAD makes it an unlawful employment practice

For an employer, because of the ... age ... of any individual ... to discharge ..., unless justified by lawful considerations other than age, from employment such individual ....

[N.J.S.A. 10:5-12(a).]

In order to establish his claim of age discrimination, plaintiff may utilize either of two legal theories: (1) that he was the victim of intentional discrimination or "disparate treatment" (*McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817,

36 *L.Ed.*2d 668 (1973)) or (2) that his layoff resulted not from any discriminatory motive, but rather from the application of facially neutral criteria that had a disproportionate impact on members of his age group (*Griggs v. Duke Power Co.,* 401 *U.S.* 424, 91 *S.Ct.* 849, 28 *L.Ed.*2d 158 (1971). *See gen., Massarsky v. General Motors Corp.,* 706 *F.*2d 111, 117 (3d Cir.), *cert. denied,* 464 *U.S.* 937, 104 *S.Ct.* 348, 78 *L.Ed.*2d 314 (1983).[5] Plaintiff in this matter has chosen to proceed on a theory of disparate treatment.

To establish disparate treatment as the result of age in a reduction in force case such as this in which plaintiff's job was eliminated, plaintiff must establish initially[6] that: (1) statutory protections against age discrimination apply to him; (2) he was laid off from a job for which he was qualified; and (3) other, younger, workers were treated more favorably. *Armbruster v. Unisys Corp.,* 32 *F.*3d 768, 777 (3d Cir.1994); *Seman v. Coplay Cement Co.,* 26 *F.*3d 428, 431 (3d Cir.1994); *Billet v.. CIGNA Corp.,* 940 *F.*2d 812, 816 n. 3 (3d Cir.1991); *Turner v.. Schering–Plough Corp.,* 901 *F.*2d 335, 342 (3d Cir.1990); *Healy v. New York Life Ins. Co.,* 860 *F.*2d 1209, 1214 n. 1 (3d Cir.1988), *cert. denied,* 490 *U.S.* 1098, 109 *S.Ct.* 2449, 104 *L.Ed.*2d 1004 (1989); *Massarsky, supra,* 706 *F.*2d at 118. Once plaintiff makes this showing, a presumption of discrimination is created. *Texas Dept. of Commu-*

---

[5] The court in *Massarsky,* like other courts considering claims brought under the federal *Age Discrimination in Employment Act of* 1967 (ADEA), 29 *U.S.C.* §§ 621 to 634, has adopted precedent construing Title VII of the *Civil Rights Act. Id.,* 706 *F.*2d at 117. New Jersey courts construing the New Jersey LAD have done so, as well. *Shaner v. Horizon Bancorp.,* 116 *N.J.* 433, 437, 561 *A.*2d 1130 (1989); *Peper v. Princeton University Board of Trustees,* 77 *N.J.* 55, 81, 389 *A.*2d 465 (1978).

[6] The following factors, derived from federal precedent, have been modified to reflect the fact that the New Jersey LAD does not specify the ages to which the Act applies, whereas the ADEA establishes a protected class of persons over the age of forty. 29 *U.S.C.* § 631(a).

*nity Affairs v. Burdine,* 450 *U.S.* 248, 254, 101 *S.Ct.* 1089, 1094, 67 *L.Ed.*2d 207, 216 (1981).

The applicable evidential standards, presumptions, and burdens of production and proof that apply thereafter have been set forth by the Supreme Court's decisions in *Burdine, supra,* as modified by *St. Mary's Honor Center v. Hicks,* 509 *U.S.* 502, 113 *S.Ct.* 2742, 125 *L.Ed.*2d 407 (1993). As those cases establish, in order to rebut the presumption of discrimination raised by plaintiff's *prima facie* case, the employer must come forward with evidence of a legitimate, nondiscriminatory reason for the layoff. *Burdine, supra,* 450 *U.S.* at 253, 101 *S.Ct.* at 1093, 67 *L.Ed.*2d at 215; *Hicks, supra,* 509 *U.S.* at 506–07, 113 *S.Ct.* at 2747, 125 *L.Ed.*2d at 416. If the employer provides such evidence, the presumption of discrimination disappears. *Hicks, supra,* 509 *U.S.* at 509–11, 113 *S.Ct.* at 2748–49, 125 *L.Ed.*2d at 417–18. The burden of production then shifts back to the employee to show that the stated reason is a mere pretext. *Burdine, supra,* 450 *U.S.* at 256, 101 *S.Ct.* at 1095, 67 *L.Ed.*2d at 217; *Hicks, supra,* 509 *U.S.* at 507–08, 113 *S.Ct.* at 2747, 125 *L.Ed.*2d at 416. He may do so either by persuading the court directly "that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." [7] *Burdine, supra,* 450 *U.S.* at 256, 101 *S.Ct.* at 1095, 67 *L.Ed.*2d at 217.

Although the burden of production shifts from the employee to the employer and back to the employee in this type of case, the employee retains the burden of proof throughout that his treatment was caused by purposeful or intentional discrimination. *Burdine, supra,* 450 *U.S.* at 253, 101 *S.Ct.* at 1093, 67 *L.Ed.*2d at 215, *Hicks, supra,* 509 *U.S.* at 507, 113 *S.Ct.* at 2747, 125 *L.Ed.*2d at 416; *Kelly v. Bally's Grand, Inc.,* 285 *N.J.Super.* 422, 429–30,

---

[7] The latter showing permits, but does not compel a finding in plaintiff's favor. *Hicks, supra,* 509 *U.S.* at 511, 517–18, 113 *S.Ct.* at 2749, 2752–53, 125 *L.Ed.*2d at 418–19, 422–23.

667 *A*.2d 355 (App.Div.1995). In this connection, plaintiff need not prove that age was the sole or exclusive consideration in the determination to lay him off. He must, however, "prove by a preponderance of the evidence that it made a difference in the decision to discharge him." *Turner, supra,* 901 *F*.2d at 342.

Judgment for defendant can of course be granted as a matter of law if plaintiff fails to set forth a *prima facie* case of disparate treatment. *Cf. Baxter v. AT & T Communications,* 712 *F.Supp.* 1166, 1171 (D.N.J.1989) (recognizing bases for summary judgment). However, one court has observed, after surveying cases in which layoffs were alleged to have resulted from age discrimination:

> because the prima facie case is easily made out, the prima facie case is rarely the focus of the ultimate disagreement. Rather, "the exigencies of a reduction-in-force can best be analyzed at the stage where the employer puts on evidence of a non-discriminatory reason for the [discharge]." *Coburn v. Pan American World Airways, Inc.,* 711 *F*.2d 339, 343 (D.C.Cir.) *cert. denied* 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983). Generally, the focus of age discrimination cases centers [on] the defendant's articulated legitimate business reasons and the plaintiff's evidence of pretext.

[*Healy, supra,* 860 *F*.2d at 1214 n. 1.]

In this case, plaintiff Murray has presented sufficient facts to establish a *prima facie* case of disparate treatment by the Newark Housing Authority. He was 65 years of age at the time of his termination, and therefore protected by the age discrimination provisions of the New Jersey LAD. *Kelly, supra,* 285 *N.J.Super.* at 430, 667 *A*.2d 355. Evidence demonstrates that he performed his job in a competent fashion, and, indeed, was considered sufficiently proficient to be called upon to teach others. And clearly, other provisional boiler operators that were younger than plaintiff [8] were retained after the NHA's reduction in force, where-

---

[8] Plaintiff is not required to demonstrate that all others who were retained fell outside the protected class. In a decision construing the age discrimination provisions of the ADEA (which apply to workers over forty) the Supreme Court held:

as plaintiff was not.[9]

Having established a *prima facie* case of discrimination, the burden of production shifts to defendant Housing Authority to offer a legitimate, nondiscriminatory reason for its choice of plaintiff as one of the three provisional boiler operators to be terminated. As stated by the *Burdine* Court,

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. [Citation omitted.] It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

> [*Id.,* 450 *U.S.* at 254–55, 101 *S.Ct.* at 1094–95, 67 *L.Ed.*2d at 216–17.]

---

The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). This language does not ban discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.* Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40 year-old is replaced by a 39 year-old than when a 56 year-old is replaced by a 40 year-old. Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.

*O'Connor v. Consolidated Coin Caterers Corp.,* 517 *U.S.* 308, 311, 116 *S.Ct.* 1307, 1310, 134 *L.Ed.*2d 433, 438 (1996).

[9] As explained by the Court in *Burdine,* "the prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection"—lack of qualifications or a job vacancy. 450 *U.S.* at 253–54, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 215–16. *See also Teamsters v. United States,* 431 *U.S.* 324, 358, and n. 44, 97 *S.Ct.* 1843, 1866, and n. 44, 52 *L.Ed.*2d 396, 429, and n. 44 (1977).

■ In the present case, the NHA has presented evidence that budgetary considerations required the lay-off of provisional boiler operators. If evidence demonstrated that termination of *all* of the NHA's provisional boiler operators had been economically mandated and all had been terminated, that evidence would have met the NHA's burden of production. However, evidence has established that termination of only three out of six such operators was required.

> A plaintiff who claims unlawful discrimination in the termination of employment may prevail notwithstanding the fact that his or her job was eliminated as part of a corporate reorganization or reduction in workforce, for " 'even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons." ' *Maresco v. Evans Chemetics, Division of W.R. Grace & Co.,* 964 *F.*2d 106, 111 (2d Cir.1992) (*quoting Hagelthorn v. Kennecott Corp.,* 710 *F.*2d [76] at 81 [ (2d Cir.1983) ].

> [*Cronin v. Aetna Life Ins. Co.,* 46 *F.*3d 196, 204 (2d Cir.1995).]

Further evidence by the NHA as to the means by which the termination decision was made is therefore required in order for the NHA's burden to be fulfilled.

It is here that defendant NHA's defense falters, since the NHA was unable to describe those means "with sufficient clarity so that plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine, supra,* 450 *U.S.* at 255–56, 101 *S.Ct.* at 1095, 67 *L.Ed.*2d at 217. Indeed, the NHA was unable to provide any detail whatsoever as to the means by which its allegedly "random" selection was made. Because of this evidential deficiency, plaintiff has been denied the full and fair opportunity to demonstrate pretext that the *Burdine* Court has mandated, since plaintiff lacks concrete facts regarding the circumstances of his termination that he can challenge. As previously noted, *Burdine* holds that the sufficiency of the defendant's evidence is to be judged by whether it frames the factual issues with enough clarity that they can be met by plaintiff. *Id.* Because defendant's evidence fails to meet this requirement, I find it to be insufficient as a matter of law to meet the burden of production placed on defendant at this point in the proofs. In essence, defendant's proofs have no more signifi-

cance than if defendant had remained silent.[10]  *Cf., Hicks, supra,* 509 *U.S.* at 509, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417.

Accordingly, the presumption of discrimination [11] that arose upon plaintiff's presentation of a *prima facie* case remains unrebutted.

> To establish a "presumption" is to say that a finding of the predicate fact (here, the prima facie case) produces "a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination.)
>
> [*Hicks, supra,* 509 *U.S.* at 506, 113 *S.Ct.* at 2747, 125 *L.Ed.*2d at 416.]

Because the NHA did not explain its conduct, a finding of intentional discrimination on the basis of age in violation of the New Jersey LAD is the "required conclusion" in this case.[12]  As stated by the Court in *Hicks,*

> At the close of the defendant's case, the court is asked to decide whether an issue of fact remains for the trier of fact to determine.  None does if, on the evidence presented, (1) any rational person would have to find the existence of facts constituting a prima facie case, and (2) the defendant has failed to meet its burden of production—*i.e.,* has failed to introduce evidence which, *taken as true,* would

---

[10] In reaching this conclusion, I am distinguishing between evidence that is insufficient to meet defendant's burden and evidence that is sufficient, but incredible.

[11] A prima facie case under McDonnell Douglas raises an inference of discrimination ... because we presume [the employer's] acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *See Teamsters v. United States, supra,* 431 *U.S.* at 358 n. 44, 97 *S.Ct.* at 1866 n. 44, 52 *L.Ed.*2d at 429 n. 44. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.

  *Furnco Construction Corp. v. Waters,* 438 *U.S.* 567, 577, 98 *S.Ct.* 2943, 2949–50, 57 *L.Ed.*2d 957, 967 (1978).

[12] The case therefore differs from *Hicks,* where the court below found that defendant had proffered two reasons for its conduct, but found those reasons to be pretextual.  On appeal, the Supreme Court held that "[b]y producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production, and thus placed themselves in a "better position than if they had remained silent." *Id.,* 509 *U.S.* at 509, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417 (emphasis in original). *Compare also, Kelly, supra,* 285 *N.J.Super.* at 433, 667 *A.2d* 355.

*permit* the conclusion that there was a nondiscriminatory reason for the adverse action. In that event, the court must award judgment to the plaintiff as a matter of law ....

[*Id.*, 509 *U.S.* at 509, 113 *S.Ct.* at 2748, 125 *L.Ed.*2d at 417 (emphasis in original).]

If I were to find defendant's evidence sufficient to meet its burden, which I do not, the result would be the same, since I find as a matter of fact that the vague, contradictory and unsubstantiated descriptions of the NHA's allegedly "random" selection process given by defendant's witnesses are incredible (and, in light of prior deposition testimony, more likely than not mendacious) and that plaintiff has sustained his burden of demonstrating that the NHA's termination of his employment was discriminatorily motivated. In reaching this conclusion I have considered plaintiff's evidence, consisting of his age, his exemplary work record, his competence as demonstrated by his passing score on the State's certification test, his seniority, and his essentially unexplained termination, as well as the lack of any evidence by defendant that other, retained, employees were better qualified or possessed other qualities that mandated their retention.[13] I am legally entitled to infer discrimination from such evidence, and I do so.

In reaching this conclusion, I have distinguished as I must between an inference legitimately drawn from the evidence presented and the presumption initially raised by plaintiff's *prima facie* case. As noted previously, *Hicks* holds that once defendant offers competent evidence of nondiscriminatory reasons for its conduct (however incredible) the presumption of discriminatory conduct raised by plaintiff's *prima facie* evidence disappears. *Id.*, 509 *U.S.* at 509–11, 113 *S.Ct.* at 2748–49, 125 *L.Ed.*2d at 417–18. *Hicks* does not similarly reject inferences, but rather holds:

[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the

---

[13] The fact that the NHA terminated its two oldest and its youngest provisional employees also suggests that age may have been a factor in the Authority's decision, since the two oldest could have been deemed near retirement, and thus in less need of employment, and the youngest deemed most capable of finding alternate work.

elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and ... upon such rejection, "[n]o additional proof of discrimination is *required* [.]"

> [*Id.* 509 *U.S.* at 511, 113 *S.Ct.* at 2749, 125 *L.Ed.*2d at 418–19 (emphasis in original), quoting from *Hicks v. St. Mary's Honor Center,* 970 *F.*2d 487, 493 (8th Cir.1992).]

I find the required proofs to have been established in this case.

## C. *Damages*

The prevailing party in an action instituted under the New Jersey LAD is entitled, upon proper proofs, to an award of compensatory and punitive damages, together with attorneys fees. *N.J.S.A.* 10:5–3, 10:5–13 and 10:5–27.1.

■ In this case, plaintiff seeks compensatory damages consisting of back pay and benefits, as well as damages for emotional distress. Uncontradicted trial evidence reveals that at the time of plaintiff's discharge, his annual salary was $28,070, and that the NHA contributed $77 bi-weekly to his pension. Plaintiff was terminated on August 6, 1993; the other provisional boiler operators were retained to September 23, 1994, when they, too, were laid off. Plaintiff's claim for wages [14] and pension payments for the period set forth, minus the amount of unemployment benefits received,[15] will be allowed. Plaintiff's additional claim for unreim-

---

[14] An award of gross pay will be made, because that portion of the award is taxable. *Commissioner of Internal Revenue v. Schleier,* 515 *U.S.* 323, 115 *S.Ct.* 2159, 132 *L.Ed.*2d 294 (1995) (holding that amounts received by a taxpayer in settlement of an ADEA claim were not within an exclusion to gross income provided by 26 *U.S.C.* § 104(a)(2) for damages on account of personal injuries or sickness). *See also Wachstein v. Slocum,* 265 *N.J.Super.* 6, 625 *A.*2d 527 (App.Div.), *certif. denied,* 134 *N.J.* 563, 636 *A.*2d 521 (1993).

[15] It is unlikely that *N.J.S.A.* 2A:15–97, which eliminates the applicability of the collateral source rule to actions brought for "personal injury," mandates this result, since plaintiff's loss of income cannot fairly be described as such an injury in a LAD context. *See Schleier, supra,* 515 *U.S.* at 330–331, 115 *S.Ct.* at 2164, 132 *L.Ed.*2d at 303. Nonetheless, the set off is in keeping with the mitigation principles expressed by the New Jersey Supreme Court in *Goodman v. London Metals Exchange, Inc.,* 86 *N.J.* 19, 429 *A.*2d 341 (1981). *Cf. Troxell v. New Jersey*

bursed sick and vacation time will not, since insufficient proof of that claim was presented at trial.

An award of $4,000 in damages for emotional distress will also be entered. As stated by Circuit Judge Mansmann, construing New Jersey law in *Delli Santi v. CNA Ins. Companies,* 88 *F.*3d 192, 205 (3d Cir.1996):

> Under the LAD, an employee can recover damages for pain and suffering. N.J. Stat. Ann. § 10:5–3; *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476 [638 *A.*2d 1341] ... (App.Div.), *certif. denied,* 136 *N.J.* 298 [642 *A.*2d 1006] ... (1994). To recover these damages, an employee does not need to present either expert testimony or objective corroboration. *See Rendine v. Pantzer,* [141 *N.J.* 292, 312, 661 *A.*2d 1202 (1995)]; *see also Bolden v. SEPTA,* 21 *F.*3d 29, 34 (3d Cir.1994) (expert medical testimony is not required to prove damages for emotional distress in a case brought under § 1983). We hasten to add, however, that "New Jersey courts have been careful to award such damages only in cases where the record demonstrates a 'substantial basis for compensation.'" *Abrams v. Lightolier, Inc.,* 841 *F.Supp.* 584, 593 (D.N.J.1994) (quoting *Castellano v. Linden Bd. of Educ.,* 79 *N.J.* 407, [411, 400 *A.*2d 1182] .... (1979)), *aff'd,* 50 *F.*3d 1204 (3d Cir.1995).
>
> [*Id.*].

At trial, plaintiff testified convincingly that he had suffered substantial pain and humiliation as the result of his termination by the NHA. He stated that, for a two-year period, he felt depressed and ashamed; that all he could picture was himself, looking for a job. During unspecified portions of that time, plaintiff felt ill, experiencing physical symptoms that he associated with his upset and depression, consisting of headaches, stomach pains and vomiting. Additionally, plaintiff testified that his relations with his wife had deteriorated as the result of his emotional condition.

I will also award reasonable attorneys' fees and costs to plaintiff as the prevailing party in this matter upon submission of a certification of services rendered. *N.J.S.A.* 10:5–27.1. Although I recognize that the entity against which those fees will be assessed is public, that fact does not mandate a contrary result.

---

*Turnpike Auth.,* 92 *N.J.A.R.*2d (CRT) 89 (1992) (denying set off when repayment of benefits was statutorily mandated).

*Robb v. Ridgewood Bd. of Educ.,* 269 *N.J.Super.* 394, 403, 635 *A.*2d 586 (Ch.Div.1993).

I will not award punitive damages, finding insufficient evidence in the record of conduct that was "especially egregious" as that term has been construed by the New Jersey Supreme Court in a LAD context.[16]  *See, Rendine v. Pantzer,* 141 *N.J.* 292, 314–15, 661 *A.*2d 1202 (1995).  In doing so, I note that the mere finding of an intentional act of discrimination is insufficient to support a punitive damage award.  *See, e.g., Turner, supra,* 901 *F.*2d at 346 ("The evidence necessary to support such a finding must go beyond that necessary to show that [the employer] intentionally discriminated against [plaintiff] because of his age; rather, there must be 'some additional evidence of outrageous conduct' that distinguishes this from the ordinary, though still reprehensible, case of age discrimination.), *quoting, Dreyer v. Arco Chemical Co. Div. of Atl. Richfield,* 801 *F.*2d 651, 658–59 (3d Cir.1986), *cert. denied,* 480 *U.S.* 906, 107 *S.Ct.* 1348, 94 *L.Ed.*2d 519 (1987).  In the present case, I find intent, but on the evidence presented, I find no more.  For that reason, punitive damages will not be assessed.

---

[16] Such damages against a public entity are available.  *Gares v. Willingboro Twp.,* 90 *F.*3d 720 (3d Cir.1996); *Abbamont v. Piscataway Twp. Bd. of Educ.,* 269 *N.J.Super.* 11, 634 *A.*2d 538 (App.Div.1993), *aff'd,* 138 *N.J.* 405, 650 *A.*2d 958 (1994).