**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1205-17T3

CHRISTINA LIRO,

      Plaintiff-Appellant,

v.

INSPIRA MEDICAL CENTERS,
INC. and INSPIRA HEALTH
NETWORK, INC.,

      Defendants-Respondents.

_____

Argued January 8, 2019 – Decided August 2, 2019

Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Docket No. L-0567-16.

Edith A. Pearce argued the cause for appellant (The Pearce Law Firm, PC, attorneys; Edith A. Pearce, on the brief).

Michael J. Wietrzychowski argued the cause for respondents (Schnader Harrison Segal & Lewis, LLP, attorneys; Lisa J. Rodriguez and Michael J. Wietrzychowski, on the brief).

PER CURIAM

Plaintiff Christina Liro appeals from an October 16, 2017 order for summary judgment dismissing her complaint against defendants Inspira Medical Centers, Inc., and Inspira Health Network, Inc., for violations of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, breach of contract and promissory estoppel. We affirm.

I.

We discern the following facts from the parties' Rule 4:46-2 submissions.

Plaintiff was enrolled as a medical resident in defendants' Family Medicine Residency Program from July 1, 2011, to January 16, 2013.[1] Plaintiff entered into a Resident Agreement with defendants on May 13, 2011. The Agreement appointed plaintiff as a resident for a two-year period, from July 1, 2011, to June 30, 2013, and stated defendants could terminate the agreement "at any point in time for the grounds specified herein."

On August 30, 2011, plaintiff received a verbal counseling, which her October quarterly evaluation form noted concerned "[d]ifficulty during surgical

---

[1] The program originated with South Jersey Hospital, Inc., which became defendant Inspira Medical Centers, Inc., on May 1, 2013, the parent corporation of which is defendant Inspira Health Network, Inc.

rotation requiring counseling session." Plaintiff testified the matter was resolved and should not have been recorded and held against her.

Sometime in August 2011, plaintiff discovered she was pregnant; the pregnancy was not planned or expected. Plaintiff told four other residents she was pregnant. Plaintiff said she did not tell anyone else because she did not want news of her pregnancy "to adversely affect [her] chances for the orthopedic [residency] program" to which she hoped to be admitted. Plaintiff also contends Dr. Michael J. Geria, the Director of Medical Education and Director of the OB/GYN Residency Program, "knew she was pregnant around September 2011," but this contention is based entirely on hearsay and conflicts with the statements in Dr. Geria's affidavit.

Plaintiff applied to the Orthopedic Residency Program sometime in the summer or fall of 2011. Plaintiff was one of forty-two applicants selected for an interview, but she was ultimately not chosen.[2]

In March 2012, plaintiff was doing an orthopedic rotation with two other first-year male residents as part of her residency. Plaintiff testified she asked Jennifer McIntyre, the Residency Coordinator, at the end of February if she

---

[2] Plaintiff states in her brief on appeal that she "does not seek to move forward with regard to her claims of exclusion from the [orthopedic] program."

A-1205-17T3

could be moved off of the orthopedic rotation because it was physically demanding and she was suffering from swollen legs and feet. Plaintiff testified she told McIntyre that she was pregnant at this time and McIntyre said plaintiff could not be moved off of the rotation because the two other residents on the rotation with her had already been switched to other services. Plaintiff states this is the only instance in which she reported to defendants that she was disabled or had a condition that could qualify her as disabled. However, in her deposition, McIntyre denied that plaintiff made any request to be moved off of the orthopedic rotation and denied that plaintiff told her she was pregnant.

Dr. Fred McAlpin, III, the Director of the Orthopedic Residency Program, received a complaint that plaintiff failed to make rounds at the hospital at her scheduled time. Dr. McAlpin met with plaintiff on March 8, 2012. Plaintiff asserted she had made the rounds, but she had not written anything on the patients' charts because she saw the attending doctor had already been there and had made notes. Dr. McAlpin advised plaintiff that she should always make the appropriate rounds and enter the appropriate documentation on each chart, regardless of whether the attending doctor had already seen the patients and written in the charts. Dr. McAlpin also asked plaintiff if there were any issues that would impact her performance or make it difficult for her to continue the

4

orthopedic rotation. Plaintiff did not report her swollen legs and feet or any other issues to Dr. McAlpin at this time. Plaintiff never saw a healthcare provider regarding her swollen legs and feet or submitted medical documentation regarding any limitations on her ability to perform the orthopedic rotation at that time.

Plaintiff requested March 16, 2012, off to attend a doctor's appointment. Plaintiff also requested time off for the week of March 26 to 30, 2012. Plaintiff did not attend a doctor's appointment on March 16, but believes she took the day off anyway. Plaintiff attended a wedding in Baltimore, Maryland, on Saturday, March 17, 2012.

On March 19, 2012, plaintiff asked to move her paid time off request from March 26 to 30, 2012, up to March 19 to 23, 2012, because of "some health issues that have become urgent." Plaintiff was expected back at the program on March 26, 2012. Plaintiff never requested medical leave or other leave with her pregnancy as the stated reason.

On March 26, 2012, plaintiff did not appear for her rotation. Plaintiff had miscarried her child at her townhome, where she was found on March 27 and taken to the hospital.

Another resident informed Dr. Geria that plaintiff was a patient in the hospital. Dr. Geria states this is the first time he learned plaintiff had been pregnant. Dr. Geria told plaintiff she was entitled to medical leave, and plaintiff requested and was given medical leave from March 19 to June 4, 2012.

On May 3, 2012, while plaintiff was out on leave, she emailed Dr. Geria, stating she intended to complete her first year residency with defendants, which ended in July, but was considering transferring to a program in Texas closer to her family. Plaintiff called a program at Plaza Medical Center in Texas to make inquiries, but never applied to that program.

Plaintiff returned to the residency program on June 4, 2012. At this time, she informed defendants she was going to continue with defendants' residency program and not transfer to a program in Texas.

Two residents transferred into defendant's Family Medicine Residency Program during plaintiff's medical leave. Plaintiff alleges defendants hired one of these residents in her place and "were not sure what to do with her since there were only so many second-year positions." The residency program was approved for eighteen residents, and there were only thirteen residents in the program during plaintiff's medical leave. The resident plaintiff alleges took her

place was hired for a first-year position to begin in July 2012, the time at which plaintiff was scheduled to begin her second year of residency.

Prior to the start of each academic year, a monthly rotation schedule is created for each resident in the residency program for the entire academic year. Plaintiff was assigned to a monthly rotation schedule for her first year, which also included an outpatient clinic for one half-day per week. Because of her medical leave from March 19 to June 4, 2012, plaintiff did not complete some of her first-year rotations; she missed one week in orthopedics, four weeks in OB/GYN, and four weeks in OP/GYN. Defendants indicated that at one point they intended to have plaintiff make up her remaining first-year rotations during her elective weeks, which were to be scheduled in fall 2012. It did not matter, in terms of full program completion, when plaintiff made up her first-year rotations as long as she completed them before she graduated from the program.

Plaintiff testified that when she returned from medical leave in June 2012, she did not receive a twelve-month schedule for her second year of residency. Plaintiff also claimed she asked to make up the first-year rotations she missed immediately upon returning from leave, but her request was denied. Plaintiff completed two of her second-year rotations, gastroenterology and emergency medicine, in July and August after she returned from leave.

Upon returning to the program on June 4, 2012, plaintiff was assigned to a Medicine 3 rotation. Plaintiff was absent on June 14 and 15, 2012. Plaintiff contacted some of the other residents on those days and emailed the Graduate Medical Education Office the day after her absences. Plaintiff contends she called out the same way she had seen another resident do so and disputes that it was regular procedure and understood by residents that they should communicate with the attending physician and graduate office if they were not going to be at a rotation.

Plaintiff was called to a meeting on July 6, 2012, to discuss her June 14 and 15 "no call no shows." Plaintiff was told she must contact the Graduate Medical Education Office and her attending physician on the day of an absence. The substance of the meeting was recorded in a July 12, 2012 memorandum that plaintiff signed. Plaintiff was informed there was a place for her in the program going forward. Plaintiff testified she thought it was a meeting to address how to make up the time she missed while on leave, a topic that was not discussed, and that "[i]t was a disciplinary meeting basically, although no . . . disciplinary action was written or taken."

Although plaintiff had not yet completed all of her first-year work, in July 2012 plaintiff began her second-year rotations in the residency program and

defendants increased her pay to that of a second-year resident. On August 30, 2012, Dr. Geria sent a letter to the New Jersey State Board of Medical Examiners stating that "[f]ull credit will be granted for the year as of [October 10, 2012]." On September 5, 2012, Dr. Geria signed and submitted a certification form to the State of New Jersey stating plaintiff was "being appointed as a member of the resident staff . . . . for the level PGY2" beginning on "October 10, 2012."

Plaintiff was assigned to complete an outpatient clinic at CompleteCare. On July 16, 2012, plaintiff emailed Dr. Geria, Dr. Robert J. Smick, Director of the Family Medicine Residency Program, and her mother regarding her assigned outpatient clinic, which she was concerned did not have enough room for her, and how she would make up the time lost during her medical leave. Within half an hour of his receipt of plaintiff's email, Dr. Geria emailed plaintiff describing how defendants intended for her to make up her hours, stating they were waiting to hear from plaintiff as to when she was ready to complete those rotations and would find an office to make it work, and plaintiff responded, "Ok, thank you."

On July 16, 2012, Dr. Smick confirmed CompleteCare was a good place for plaintiff to continue her outpatient clinic. Plaintiff was scheduled to work at CompleteCare each Monday beginning on July 16. Plaintiff was absent from the site on July 16, 23, 30 and August 6, 2012, four consecutive Mondays.

Plaintiff testified that, although another resident had told her to report to CompleteCare on July 16, she did not go because she "was not told by anyone of authority that that was where [she] was supposed to go," and by the time Dr. Smick confirmed her assignment, the assigned shift was over. Plaintiff stated she was "post call" on July 23; that is, she had worked the night before and was not allowed to work the next day, but she did not contact CompleteCare and advise its staff that she would not be present.

After the third "no call no show" on July 30, CompleteCare stated it no longer wished to work with plaintiff. Dr. Smick explained plaintiff had called out sick, and he emailed plaintiff telling her to add Dr. Ismail, her attending physician at CompleteCare, to her contact list. Plaintiff did not report to CompleteCare on August 6 because her air conditioner had broken, but she did not contact CompleteCare or Dr. Ismail. After the fourth "no call no show," two CompleteCare employees, one being the Chief Medical Officer, reiterated that they no longer wanted plaintiff as a resident.

Plaintiff contends that, although she was told to add Dr. Ismail to her contact list in an email regarding her third absence from CompleteCare, she was not told to contact Dr. Ismail in the event she could not attend her clinic as scheduled at CompleteCare.

At the end of July 2012, Dr. Smick completed an evaluation form for plaintiff's first year of residency and noted she was meeting expectations. Dr. Smick also completed a form sent to the American Osteopathic Association that stated plaintiff was "making adequate progress at this point."

In August 2012, plaintiff was suspended from the residency program with pay because of her "no call no show" absences at CompleteCare.

On August 14, 2012, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) claiming discrimination and retaliation on the basis of gender/sex, pregnancy and disability. On August 31, 2012, defendants finalized a remediation plan with plaintiff, which had been revised and incorporated many of plaintiff's suggested changes. The remediation plan addressed attendance and procedures for calling out of work, the issues which had led to plaintiff's suspension, but did not address a plan for plaintiff to make up the rotations she missed. Plaintiff signed the remediation plan and returned to the residency program on September 4, 2012.

Plaintiff alleges that four male residents who had "no call no shows" similar to hers were not disciplined. The allegation is based entirely on hearsay, and plaintiff testified she did not have personal knowledge or know with certainty the circumstances surrounding the four residents' absences, including

11

their reasons, whether they contacted anyone, the existence of mitigating circumstances, or whether they were disciplined. Plaintiff also testified that, when she referred to these residents not being disciplined, she meant they were not "suspended or demoted."

Only one resident engaged in conduct similar to that resulting in plaintiff's suspension with pay—being absent for a month without proper notification to an outpatient clinic—and that resident was terminated from the program because of her "no call no show" to her outside clinical rotation. Three other residents received verbal counseling for various reasons, but they did not have "no call no show" issues to the extent of plaintiff's.

Sometime in September 2012, plaintiff discovered she was pregnant again, and she was monitored for high risk pregnancy. On September 19, 2012, plaintiff notified defendants that her treating physician ordered her to take a medical leave of absence effective September 19. The medical leave request form cited depression and a "hostile work environment," but did not mention plaintiff's second pregnancy and stated pregnancy was not the reason for the leave requested. Plaintiff provided a physician's note requesting one month of medical leave to end on October 19, 2012, pending further evaluation.

On October 2, 2012, plaintiff emailed a completed leave of absence request form to Human Resources requesting three months of medical leave ending on December 19, 2012. Defendants granted plaintiff's medical leave request. In October 2012, plaintiff broke the lease on her New Jersey townhouse and moved to Georgia.

On December 4, 2012, Maria DeLiberis, the Human Resources Manager for plaintiff's residency program, called and emailed plaintiff to obtain an update on her medical leave, which was due to expire in approximately two weeks. On December 7, plaintiff emailed back that she had not yet been released to return to the program by her physician. On December 13, DeLiberis emailed and said if plaintiff expected her leave to extend past the scheduled December 19, 2012 return date, she needed her physician to provide defendants with an anticipated return date and a certification. Plaintiff emailed on December 17, 2012, stating she had forwarded the leave paperwork to her physician. Plaintiff testified she mailed the leave paperwork to her physician, but never followed up.

Plaintiff's approved medical leave expired on December 19, 2012. On December 26, 2012, DeLiberis emailed plaintiff and said defendants had not received leave paperwork from her physician. Plaintiff did not respond. On January 7, 2013, the Human Resources leave of absence specialist sent a letter

to plaintiff stating her approved leave had expired and defendants had not received any forms from her physician. Plaintiff did not respond.

On January 12, 2013, plaintiff emailed the leave of absence specialist, stating her short term disability application had been denied and she needed information on how to file a workers' compensation claim. Two days later, defendants' employee health manager emailed plaintiff to offer assistance with filing her workers' compensation claim. Plaintiff never responded.

On January 16, 2013, defendants sent plaintiff a letter informing her that her resident contract was being terminated. The letter stated that defendants would consider plaintiff's reapplication to the program if she were able to return. Plaintiff never responded to the letter, never requested an appeal regarding her termination as was permitted under defendants' policy and noted in the letter, and never reapplied to the program.

Plaintiff filed a complaint against defendants on August 17, 2016, alleging the following causes of action: discrimination and retaliation on the basis of gender, pregnancy, and disability in violation of the LAD (Count I); breach of contract as to plaintiff's Resident Agreement (Count II); and promissory estoppel and detrimental reliance regarding defendants' failure to issue plaintiff a First Year Certificate of Completion and recommend the issuance of her

A-1205-17T3

physician's license (Count III).[3]   Plaintiff claimed defendants' discriminatory and/or retaliatory conduct included "treating individuals without a disability more favorably than [p]laintiff and terminating and/or constructively discharging [p]laintiff because of her known and accepted and approved disabilities . . . who is an otherwise qualified individual with a disability and an employee."   Plaintiff also alleged defendants' "employment practices . . . created a discriminatory work environment which was hostile and harassing to female employees and employees with disabilities, including [p]laintiff, and that [d]efendants failed to stop, continued, and/or encouraged the . . . discriminatory practices."

Defendants filed an answer to the complaint and subsequently moved for summary judgment, arguing plaintiff did not suffer any adverse action on account of her gender, pregnancy, or disability.   Rather, they argued plaintiff was given program rotations following her medical leave for her miscarriage and engaged in a series of "no call no shows," which resulted in a short suspension with pay, after which she went out on leave again a few weeks later

[3] Plaintiff previously filed a complaint against defendants in the United States District Court for the District of New Jersey.  Plaintiff's federal claims were dismissed with prejudice and her state law claims were dismissed without prejudice on July 21, 2016.  Plaintiff timely refiled her state law claims within thirty days of the court's dismissal pursuant to 28 U.S.C. 1367(d).

15                                                          A-1205-17T3

and ultimately ceased communicating with defendants concerning her return date, leaving defendants no choice but to terminate her contract. Plaintiff opposed the motion arguing that, despite promises to the contrary, defendants had no intention of assigning plaintiff to the rotations necessary to complete her First Year Certificate, knew she could not finish these rotations by the end of her first year, and treated her differently than other residents. Plaintiff also argued defendants retaliated against her for taking leave due to her disability and filing an EEOC complaint, and she was constructively discharged.

The motion court heard argument and issued a decision from the bench and an order granting defendants summary judgment as to all of plaintiff's claims.

Plaintiff appeals and presents the following arguments.

> POINT I
>
> THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT[]S BY APPLYING AN IMPROPER LEGAL STANDARD IN DECIDING THE MOTION FOR SUMMARY JUDGMENT[.]
>
> POINT II
>
> THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT[S], BY ACTING AS THE FACT FINDER AND IMPROPERLY WEIGHING EVIDENCE[.]

POINT III

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANT[S], BY OVERLOOKING/IGNORING FACTS IN THE RECORD REGARDING PLAINTIFF'S CLAIMS OF BREACH OF CONTRACT AND CLAIMS OF VIOLATIONS OF THE NEW JERSEY LAW AGAINST DISCRIMINATION[.]

A. Breach of Contract Claim[.]

B. Defendants violated the New Jersey Law Against Discrimination by harassing and discriminating against Plaintiff, thereby creating a hostile work environment, because of her gender, pregnancy and/or disability, ultimately resulting in her constructive discharge.

II.

"An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). We review a grant of summary judgment de novo and determine whether there are any genuine issues of material fact when the evidence is viewed in the light most favorable to the non-moving party. Rowe v. Mazel Thirty, LLC, 209 N.J. 35, 38-41 (2012). Summary judgment is appropriate when there is no genuine issue of material fact, and the evidence "is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty

17

<u>Lobby</u>, 477 U.S. 242, 252 (1986)). We accord no deference to the motion court's legal conclusions and review issues of law de novo. <u>Kaye v. Rosefielde</u>, 223 N.J. 218, 229 (2015).

There are disputed facts in the parties' <u>Rule</u> 4:46-2 submissions, but none of the factual disputes claimed by plaintiff rise to the level of a genuine issue of material fact, <u>see</u> <u>Brill</u>, 142 N.J. at 530, 540, as we will explain. Plaintiff contends that both Dr. Geria and McIntyre were aware of her first pregnancy prior to her miscarriage. Plaintiff's assertion regarding Dr. Geria's knowledge is unsupported by competent evidence and thus does not give rise to a genuine issue of material fact. <u>See</u> <u>ibid.</u>

With regard to plaintiff's claim she informed McIntyre she was pregnant, while "genuine" issues of material fact preclude the granting of summary judgment, <u>R.</u> 4:46-2, those "of an insubstantial nature" do not, <u>Brill</u>, 142 N.J. at 530 (citation omitted). The undisputed facts establish that plaintiff did not tell her supervisors, Dr. Geria and Dr. Smick, or anyone in management that she was pregnant prior to her miscarriage and that she purposefully avoided doing so. In addition, although plaintiff mentions events prior to her miscarriage in her complaint, on appeal she has explicitly abandoned her claim of discrimination regarding the orthopedic residency hiring process and does not argue defendants'

actions prior to her miscarriage were motivated by discriminatory animus. Thus the timing of any earlier knowledge of her pregnancy on defendants' part, including by McIntyre, has no bearing on plaintiff's claims at issue, all of which are based on actions occurring after plaintiff's pregnancy and miscarriage were known. "If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of Rule 4:46-2." Id. at 540.

Plaintiff also contends she did not know until the July 6, 2012 meeting with her supervisors that she was required to communicate with her attending physician and the Graduate Medical Education Office on the days she was absent and could not make a rotation. This is, again, a dispute "of an insubstantial nature" and does not rise to the level of a genuine issue of fact. Id. at 530. Plaintiff concedes that during the July 6 meeting she was informed of defendants' expectations concerning reporting absences, defendants stated there was a place for plaintiff in the program going forward, and "no . . . disciplinary action was written or taken." Thus, whether plaintiff knew she was required to communicate with certain individuals concerning her absences prior to July 6 is irrelevant because it is undisputed plaintiff was made aware of the requirements

at the July 6 meeting and plaintiff's claims of discriminatory conduct are based on events that occurred thereafter.

Likewise, while plaintiff contends a particular male resident was hired in her place while she was on leave, the undisputed facts establish that the resident was just beginning his first year of residency when plaintiff returned from her medical leave and was scheduled for promotion to a second-year resident, and that the residency program contained sufficient openings to permit an additional resident without forcing plaintiff out. Because there "exists a single, unavoidable resolution" of this dispute—that the first-year resident plaintiff contends replaced her at the start of her second year of residency could not have taken her place in the program—it also fails to rise to the level of a genuine issue of material fact. Id. at 540.

We turn then to an analysis of the claims before us and whether "one party must prevail as a matter of law." Ibid. (citation omitted). Plaintiff argues the motion court applied an improper legal standard in deciding the motion for summary judgment and improperly weighed the evidence. Because we apply the same standard as the motion judge and review grants of summary judgment de novo without deference to the motion judge's legal interpretations, Kaye, 223 N.J. at 229, we do not address those arguments. Instead, we limit our discussion

to plaintiff's assertion that, based on the record presented, defendants are not entitled to judgment as a matter of law on her claims that defendants breached their contract with plaintiff, impermissibly harassed and discriminated against her, and created a hostile work environment resulting in plaintiff's constructive discharge.

We first consider plaintiff's argument that defendants breached the terms of her Resident Agreement by failing to provide her with the remainder of her first-year rotations and failing to provide "a fair and consistent method for review of [p]laintiff's concerns without the fear [of] reprisal." The essential elements of a prima facie case for breach of contract are: "a valid contract, defective performance by the defendant, and resulting damages." Coyle v. Englander's, 199 N.J. Super. 212, 223 (App. Div. 1985).

It is undisputed that plaintiff's Resident Agreement constituted a valid contract. However, plaintiff cites to no provision in the contract requiring that defendants provide the first-year rotations she missed while on leave before plaintiff began her second-year rotations. Plaintiff's Resident Agreement covered a two-year program ending on June 30, 2013. The contract does not require that she be given the rotations in any particular order, or that specific

rotations be scheduled at the time plaintiff wishes to have them. The contract is simply bereft of any contractual obligation supporting plaintiff's claim.

Plaintiff similarly offers no evidence supporting her assertion that defendants failed to provide a fair and consistent method for reviewing plaintiff's concerns without fear of reprisal, or that such alleged conduct constituted deficient performance under the contract. Section 3.9 of the Resident Agreement states defendants are obligated "[t]o provide a fair and consistent method for review of the Resident's concerns and/or grievances, without the fear of reprisal." However, the undisputed facts establish that whenever plaintiff voiced concerns, they were dealt with promptly and plaintiff never expressed dissatisfaction with defendants' responses until after her termination. When plaintiff emailed Dr. Geria regarding her missed first-year rotations, Dr. Geria responded within a half hour and plaintiff's reply to his stated plan was "Okay, thank you." When plaintiff emailed defendants regarding concerns about whether the CompleteCare clinic would provide her with sufficient time and patients, Dr. Smick reached out to CompleteCare and then to plaintiff, addressing all of her stated concerns, that same day. Even defendants' letter terminating plaintiff's employment noted that plaintiff had five

days within which to avail herself of defendants' appeal procedures, and plaintiff did not do so or respond to the termination letter in any fashion.

Moreover, we note that plaintiff's attempt to analogize the instant matter to that in Kass v. Brown Boveri Corp., wherein an electrical engineer was accorded management responsibilities under a contract and the employer forced him into a lesser job without managerial authority, is inapplicable. 199 N.J. Super. 42, 47 (App. Div. 1985). Plaintiff was not demoted or prevented from moving forward with her residency; she was promoted to a second-year resident position with a higher salary and was continuously assigned to rotations when not on leave or suspended with pay. Plaintiff fails to present any evidence establishing defendants breached any duties arising under the Resident Agreement. The court correctly granted summary judgment dismissing the claim.

Plaintiff also argues defendants are liable under a theory of promissory estoppel for promising adequate and appropriate means to complete her residency program and an accompanying First Year Certificate of Completion, but failing to provide the necessary rotations to do so.

This claim is barred by well settled law. "Quasi-contract liability will not be imposed . . . if an express contract exists concerning the identical subject

matter. The parties are bound by their agreement, and there is no ground for implying a promise as long as a valid unrescinded contract governs the rights of the parties." Suburban Transfer Serv., Inc. v. Beech Holdings, Inc., 716 F.2d 220, 226-27 (3d Cir. 1983); see also Moser v. Milner Hotels, Inc., 6 N.J. 278, 280 (1951) ("Having pleaded an express contract, the plaintiff cannot without showing a rescission, recover on quasi-contract."). As we discussed above, plaintiff's employment was governed by a valid contract which did not require the precise rotation schedule she desired and permitted defendants to terminate plaintiff's employment at any time, regardless of whether plaintiff had completed the program. We also note that the promissory estoppel claim articulated in plaintiff's complaint—that, "[d]espite plaintiff satisfying all of the [first year] requirements, [d]efendants have failed to issue the First Year Certificate"—is inconsistent with the undisputed facts and plaintiff's own Rule 4:46-2 submissions, both of which establish plaintiff had not completed certain first-year rotations at the time of her termination. We therefore find summary judgment was properly granted to defendants on this claim as well.

Plaintiff also argues the trial court erred in granting summary judgment because, when viewed with all inferences in plaintiff's favor, the facts clearly show defendants harassed and discriminated against plaintiff, creating a hostile

work environment because of her gender, pregnancy and disability, and resulting in plaintiff's constructive discharge. It is first necessary to distill plaintiff's argument into its separate parts as plaintiff's brief is at times unclear in its recitation of same.

We first note that, although plaintiff alleged harassment by a fellow resident in her complaint, that argument is absent from her brief on appeal, and thus is waived. Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008); Zavodnick v. Leven, 340 N.J. Super. 94, 103 (App. Div. 2001). Plaintiff also does not separately argue that the retaliation she alleged in her complaint occurred, apart from an inference of retaliation with regard to plaintiff's alleged constructive discharge, and thus that argument is waived as well.[4] Therefore, we limit our discussion of plaintiff's LAD argument to her claims of discrimination and constructive discharge.

Plaintiff asserts that defendants' conduct constituted "discrimination and their actions in doing so were harassing" and created a "hostile work

_____

[4] The standard for retaliation under the LAD requires plaintiff to show that she was engaged in protected activity known to the employer, was thereafter subject to an adverse employment action, and there is a causal link between the activity and the adverse employment consequence. Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996). Plaintiff neither addresses these elements nor presented evidence to the motion court establishing them.

environment." Plaintiff argues in her brief that she has established a prima facie case of discrimination, but cites to the standard for a hostile work environment and makes arguments partially based thereon, conflating the two claims and their respective standards. We will therefore separately address both plaintiff's claims of discrimination and of a hostile work environment under the correct standards.

Because plaintiff does not attempt to prove discrimination by direct evidence, we analyze her claims under the three-step, burden-shifting McDonnell Douglas[5] framework, which our courts have adopted. See Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005). Once the plaintiff succeeds in establishing a prima facie case of discrimination, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." Viscik v. Fowler Equip. Co., 173 N.J. 1, 14 (2002). If the defendant does so, the burden shifts back to the plaintiff to prove the employer's proffered reason was merely pretext for the discrimination. Bergen Commercial Bank v. Sisler, 157 N.J. 188, 211 (1999).

To prove a prima facie case of discrimination, plaintiff must demonstrate that she "(1) belongs to a protected class; (2) applied for or held a position for

---

[5] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

which . . . she was objectively qualified; (3) was not hired or was terminated from that position; and (4) the employer sought to, or did fill the position with a similarly-qualified person." Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 399 (2005).

"The evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the employer's action.'" Zive, 182 N.J. at 447 (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)). Plaintiff alleges that she became pregnant, suffered a miscarriage, developed disabilities as a result and encountered what she perceived as a hostile work environment upon her return to work, and was subject to various instances of discipline, including termination of her employment contract. The facts show, and defendants do not dispute, that plaintiff demonstrated a prima facie case of employment discrimination.

The burden therefore shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." Viscik, 173 N.J. at 14. As our discussion of the undisputed facts illustrates, defendants articulated legitimate, non-discriminatory reasons for each instance of disciplinary action, including the termination of plaintiff's contract.

Specifically, defendants assert that plaintiff could not be reached during a surgical rotation, did not complete patient charts, engaged in recurrent "no call no show" practices, and failed to respond to defendants' communications regarding her medical leave and return date. See Bergen Commercial Bank, 157 N.J. at 211 (explaining when an employer articulates legitimate, non-discriminatory reasons for adverse employment actions, the burden shifts to the plaintiff to establish such reasons are no more than pretext).

Plaintiff argues defendants' proffered legitimate business reasons are merely pretext for discrimination. While "the burden of production shifts throughout" the McDonnell Douglas analysis, "the employee at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination." Ibid. Plaintiff "'need not prove that [her sex, pregnancy and/or disability] was the sole or exclusive consideration' in the determination[s]" to discipline her; she "need only show 'by a preponderance of the evidence that it made a difference' in that decision." Ibid. (quoting Murray v. Newark Hous. Auth., 311 N.J. Super. 163, 174 (Law Div. 1998)).

> [I]f the employer proffers a non-discriminatory reason, plaintiff does not qualify for a jury trial unless . . . she can "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1)

> disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."
>
> [Zive, 182 N.J. at 455-56 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).]

However, "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Ibid. (alteration in original) (emphasis omitted) (citations omitted).

Here, plaintiff failed to present any evidence establishing the discipline she received or the termination of her employment occurred because of her protected status. Plaintiff first contends her August 2011 counseling for "[d]ifficulty during surgical rotation" after a supervisor could not reach her during the rotation was merely a misunderstanding and does not claim the counseling was motivated by any improper factors. Plaintiff "cannot simply

show that the employer's decision was wrong or mistaken" or argue that the employer is incompetent, but that is what plaintiff asserts. Ibid. Plaintiff contends she followed the same procedures as other residents in failing to notify her attending physician or the Graduate Medical Education Office when she was absent on June 14 and 15, 2012, but the only competent evidence supporting her assertion was that plaintiff had observed one resident do so on one occasion. There is insufficient evidence for "a reasonable factfinder" to "rationally find [defendant's proffered reason] 'unworthy of credence'" and infer a discriminatory motivation. Ibid. (citation omitted).

Plaintiff also claims her suspension with pay for "her alleged continued failure to contact CompleteCare regarding her absences" was unwarranted because she "did not know that she was supposed to" contact the attending physician at CompleteCare when she failed to appear on four separate occasions for her scheduled rotation. The undisputed facts establish plaintiff had attended several prior meetings concerning her communication with attending physicians, and plaintiff's supervisor sent her an email instructing her to add the CompleteCare attending physician to her contact list in response to her email calling out sick—an instruction plaintiff says "could mean anything" and did not say to contact that attending physician in the case of future absences. Indeed,

plaintiff's continuing failure to appear for her scheduled rotation without providing any notice to anyone at CompleteCare resulted in CompleteCare's directive that plaintiff not return. Defendants' articulated reason for the suspension—plaintiff's failure to contact CompleteCare when she was absent for four separate rotations—is established by the undisputed facts. Plaintiff points to no evidence from which "a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Zive, 182 N.J. at 455-56 (quoting Fuentes, 32 F.3d at 764).

Plaintiff asserts disparate treatment and claims four male residents who committed similar attendance infractions were not disciplined to the same extent, but this assertion is unsupported by competent evidence in the record and thus cannot support plaintiff's discrimination claim. See Brill, 142 N.J. at 530, 540. Plaintiff claims she was singled out for her use of unscheduled time off, but the undisputed facts establish that only one resident engaged in conduct similar to plaintiff's and that resident was terminated from the program. In addition, three other residents whose infractions did not rise to the level of plaintiff's conduct received verbal counseling.

Plaintiff bears the burden to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendants' asserted reasons for disciplining, suspending, and terminating plaintiff "that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes, 32 F.3d at 765 (alteration in original) (emphasis omitted) (citations omitted). Here, the undisputed facts establish that defendants consistently required plaintiff to communicate with her supervisors and attending physicians regarding her absences, plaintiff consistently did not perform, and the residents who engaged in similar conduct were disciplined or terminated. In conclusory fashion, plaintiff asserts "it is clear that [she] was being treated differently than others, with the only remaining explanation being that it was because of her sex, pregnancy and/or disability." But the evidence and undisputed facts do not support her assertion and wholly undermine it. The "issue is whether discriminatory animus motivated the employer," and plaintiff fails to present evidence permitting a rational inference that her protected status was a motive or one of the motives for the complained-of conduct. Ibid. Thus, we find the trial court properly granted defendants summary judgment as to plaintiff's discrimination claim.

Plaintiff also argues that defendants' acts created a hostile work environment. To establish a hostile work environment claim, a plaintiff must show that "the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24 (2002) (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993)).

Plaintiff's chief complaints relate to her suspension following her CompleteCare absences, her termination, and that defendants failed to provide the first-year rotations she missed during her first medical leave before she went on leave again in September 2012. For the reasons already noted, plaintiff has failed to present evidence that the alleged conduct of which she complains occurred as a result of or based on her protected status as a woman, a pregnant woman, or an individual with a disability. For this reason alone, plaintiff's hostile work environment claim fails. Ibid.

We also consider whether defendants' conduct is sufficiently severe or pervasive based on an objective standard and the totality of the circumstances, including how frequent, severe, physically threatening, humiliating, or offensive

the harassment is and whether it unreasonably interferes with plaintiff's work performance. Cutler v. Dorn, 196 N.J. 419, 431-32 (2008). We assess whether the conduct itself "is sufficiently severe or pervasive to create a hostile work environment," and neither a plaintiff's subjective response to the complained-of conduct nor a defendant's subjective intent in engaging in such conduct is determinative of whether a hostile environment claim exists. Id. at 431.

Plaintiff claims defendants' conduct from the time she returned from medical leave in June 2012 to the time she went on leave in September 2012 constituted a hostile work environment. Plaintiff argues defendants' conduct was severe and pervasive enough to alter the conditions of her employment because "she was required to take medical leave" as a result of the hostile work environment and "was not given state-mandated rotations in order to complete her residency." Our objective standard requires that we determine whether a reasonable person in plaintiff's position would consider the work environment hostile or abusive and will not take into account plaintiff's subjective response. Id. at 431. As for plaintiff's contention that defendant failed to reschedule her missed first-year rotations at the time she desired, we cannot find a reasonable person would believe this circumstance to so alter the conditions of employment that he or she would find the workplace hostile or abusive. The evidence shows

defendants were willing to work with plaintiff so she could make up the missed rotations, plaintiff had in fact been promoted and granted a pay raise on schedule following her medical leave, and plaintiff had another year of residency in which to complete the missed rotations. We find summary judgment was properly granted to defendants as to plaintiff's hostile work environment claim as the evidence "is so one-sided that [defendants] must prevail as a matter of law." Brill, 142 N.J. at 540 (citation omitted).

While plaintiff neglects to brief the issue in full, we also address her claim that she was constructively discharged. "A constructive discharge claim arises when an employee leaves the workplace because the 'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" Toto v. Princeton Township, 404 N.J. Super. 604, 615 (App. Div. 2009) (alteration in original) (quoting Shepherd, 174 N.J. at 27-28). Plaintiff must show she did everything reasonably necessary to remain employed rather than quit, and we take into consideration the nature of the alleged harassment, whether plaintiff engaged in internal grievance procedures, the employer's responsiveness to plaintiff's complaints, and any other relevant circumstances. Shepherd, 174 N.J. at 28.

Here, plaintiff requested and was granted medical leave through December 19, 2012. Plaintiff argues defendants' failure to provide the missed first-year rotations at this time resulted in a constructive discharge. However, plaintiff's contract continued through June 2013 and there is no evidence indicating she could not have completed these rotations upon returning from leave. The conditions when plaintiff took leave were such that, although she had not yet completed her first-year rotations, she had been promoted to a second-year resident and received a raise as a result. The remediation plan plaintiff signed following her suspension with pay detailed procedures for minimizing the unscheduled use of paid time off and properly notifying attending physicians and defendants when plaintiff was unable to do a rotation. These conditions are not so onerous or intolerable that a reasonable person subject to them would resign. See Toto, 404 N.J. Super. at 615.

In addition, plaintiff did not follow up with her physician regarding the paperwork necessary to extend her medical leave. Plaintiff did not respond to defendants' email offering to help her with filing a workers' compensation claim. Plaintiff did not appeal her termination, and plaintiff did not reapply to defendants' program. Plaintiff has not shown she did everything reasonable and

necessary to remain employed rather than quit or, in this instance, be terminated. See Shepherd, 174 N.J. at 28.

For these reasons, we are not convinced, based on the record presented, that a reasonable jury could find defendants' conduct was so unbearable that it forced plaintiff to abandon the workplace and choose not to return. Plaintiff failed to present evidence sufficient to support her constructive discharge claim.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1205-17T3