SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## Michele Meade v. Township of Livingston (A-52-20) (085176)

**Argued September 27, 2021 -- Decided December 30, 2021**

**FERNANDEZ-VINA, J., writing for a unanimous Court.**

In this appeal, the Court considers whether an employee's claim that her subordinate's gender bias influenced her employer's decision to terminate her, in violation of the Law Against Discrimination (LAD), is sufficient to proceed to trial.

Plaintiff Michele Meade served as Township Manager for Livingston Township for eleven years, from 2005 until her termination in 2016 by Resolution of the Township Council. The Council cited a number of performance areas in the Resolution. An area central to this appeal was Meade's supervision of Police Chief Craig Handschuch.

One notable incident occurred on April 19, 2013, when pre-school teachers at the Livingston Community Center observed a man dressed in camouflage, carrying a rifle bag, in the parking lot. The classes went into lockdown and patrol cars were dispatched. Handschuch and Sergeant Kenneth Hanna alerted the responders that the man was an officer involved in a training exercise. Meade went to the Community Center during or in the aftermath of the incident. On May 2, Hanna signed a complaint alleging that Meade had violated N.J.S.A. 2C:33-28 by using "unreasonably loud and offensive coarse or abusive language" in addressing him. On May 31, Meade emailed a report to Handschuch concluding that he and the unit conducting the training were responsible for the incident. That same day, Hanna signed a second complaint against Meade, alleging obstruction in violation of N.J.S.A. 2C:29-1. Meade was acquitted of all charges in 2014. Meanwhile, the record reflects ongoing concerns with Handschuch's performance.

Although it is not clear from the record what specifically prompted the remark, Councilmember Michael Silverman testified that he said, at a meeting held at his home in December 2014, that "Michele [Meade] would not be having this problem if her name was Michael." Other members of the Council were present at the meeting.

Meade submits that Livingston's labor attorney counseled her against taking action against Handschuch while the criminal charges related to the training incident were pending. Meade adds that, in late 2015, the labor attorney found Meade's documentation regarding the Chief's performance likely sufficient to support disciplinary

1

charges, but not termination, and suggested to Meade that she should "try to strengthen a termination case" against the Chief via an independent, outside investigation.

An email from Silverman following Handschuch's failure to appear at meetings called by the Council stated, "Bring [Chief Handschuch] up on charges, bring in an investigator or do nothing. . . . [H]e is YOUR employee . . . ." Nevertheless, Meade testified that certain members of the Council did not authorize hiring an investigator. In addition, Meade filed a certification stating that "Councilman Al Anthony . . . suggested to me that maybe Chief Handschuch did not like reporting to a woman and should report to him as the Mayor instead," a claim Anthony disputed in his deposition.

In November 2016, the Council passed a Resolution removing Meade from her position, citing "her failure to timely keep the Council informed as to issues concerning the Township; her prioritization of budget items based upon her preferences rather than the preferences of the Council; her lack of responsiveness to Township residents; her failure to effectively pursue shared service agreements with other communities; and her failure to effectively manage the Township's employees." Meade contests as false or misleading the reasons cited for her dismissal, and argues that they were pretext.

Meade filed a complaint asserting that she had been terminated based on her gender in violation of the LAD. Specifically, Meade alleged that the Council terminated her and replaced her with a male Manager "to appease the sexist male Police Chief." The trial court granted Livingston's motion for summary judgment, finding that Meade was terminated for poor work performance and that the record revealed no gender discrimination in her termination. The Appellate Division affirmed, reasoning in part that an outside investigation into the Chief was not mandatory because Meade had "authority to discharge . . . the Chief." The Court granted certification. 245 N.J. 591 (2021).

**HELD:** Here, sufficient evidence was present for a reasonable jury to find that what Livingston Township Councilmembers perceived to be Police Chief Handschuch's discriminatory attitude toward Township Manager Meade influenced the Council's decision to terminate her, in violation of the LAD. Accordingly, the Court reverses the grant of summary judgment and remands this matter for trial.

1. To analyze employment discrimination claims brought under the LAD, New Jersey has adopted the procedural burden-shifting methodology set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). The Court reviews the components of that test and of the plaintiff's prima facie case, which is evaluated solely on the evidence presented by the plaintiff, irrespective of defendants' efforts to dispute that evidence. To carry the ultimate burden of proof, the plaintiff need not prove that gender was the sole or exclusive consideration in the employer's termination decision; plaintiff need only show by a preponderance of the evidence that it made a difference in that decision. (pp. 19-22)

2.  Under the test, Meade established a prima facie case of gender discrimination:  she is a member of a protected group, performed her job for 11 years, and was replaced with a male Manager.  Livingston asserted in response that its termination of Meade was rooted in her poor performance in a number of areas.  To survive summary judgment, Meade then had to show sufficient evidence from which a reasonable jury could conclude that Livingston's asserted reasons for terminating her were mere pretext.  (pp. 22-23)

3.  Meade offered some evidence that two of the four Councilmembers who voted to terminate her had expressed the view that the Chief refused to accept a woman as his supervisor.  Although the Council alleged a number of areas of dissatisfaction with Meade's performance, a reasonable jury could conclude -- in the combined light of Meade's evidence challenging the legitimacy of the other areas of dissatisfaction and the Council's focus on the difficulties with Handschuch -- that Meade's gender played a role her termination.  The Court does not suggest that the intent or import of the alleged remarks by Silverman and Anthony -- or even the existence of the remark attributed to Anthony -- are beyond dispute.  But at the summary judgment stage, all conflicting inferences from the facts presented must be resolved in Meade's favor.  A reasonable jury could determine that the Council fired Meade because it believed that she was unable to control the Chief as a result of her gender, in violation of the LAD.  (pp. 23-25)

4.  N.J.S.A. 40A:14-147 provides that a permanent member or officer of the police department can be removed only for cause and only after notice and a hearing.  Counsel retained by Meade's employer advised Meade that the cause component was wanting, and -- considering the evidence in the light most favorable to Meade -- a jury could reasonably find that Livingston impeded Meade's efforts to terminate the Chief's employment.  The fact that other provisions grant Township Managers the ability to discipline or terminate Township officers is not dispositive.  A jury could reasonably find that Meade's hesitance to disregard counsel's advice and to fire the Chief without demonstrable cause was reasonable, given the risk of a legal challenge.  (pp. 26-28)

5.  The Court declines to adopt the cat's paw theory of liability, which applies when a biased subordinate uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.  This is not a cat's paw case.  The Court instead applies guidance from Spencer v. Bristol-Meyers Squibb Co., 156 N.J. 455 (1998), and Battaglia v. United Parcel Service, Inc., 214 N.J. 518 (2013), which reveal that actions taken to accommodate the discriminatory views of non-decisionmakers can support liability to the same extent as actions taken based on discriminatory views personally held by decisionmakers.  (pp. 28-31)

**REVERSED and REMANDED for further proceedings.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and PIERRE-LOUIS join in JUSTICE FERNANDEZ-VINA's opinion.**

SUPREME COURT OF NEW JERSEY
A-52 September Term 2020
085176

Michele Meade,

Plaintiff-Appellant,

v.

Township of Livingston,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| September 27, 2021 | December 30, 2021 |

Christopher P. Lenzo argued the cause for appellant
(Lenzo & Reis, attorneys; Christopher P. Lenzo, of
counsel and on the briefs).

Juan C. Fernandez argued the cause for respondent
(Fernandez Garcia, attorneys; Juan C. Fernandez, of
counsel and on the briefs, and Michael Garcia, on the
briefs).

Richard M. Schall argued the cause for amicus curiae
National Employment Lawyers Association of New
Jersey (Schall & Barasch, attorneys; Richard M. Schall,
on the brief).

JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

1

In this appeal, the Court considers whether discriminatory conduct toward an employee by that employee's subordinate can result in liability on the part of the employer under New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. Specifically, the issue is whether an employee's claim that her subordinate's gender bias influenced her employer's decision to terminate her is sufficient to survive summary judgment and proceed to trial.

Plaintiff Michele Meade served as the Township Manager for Livingston Township for eleven years, from 2005 until her termination in 2016 by Resolution of the Township Council. The Council alleges that it terminated Meade because of her poor job performance. Meade, however, maintains that the Council terminated her to appoint a male replacement due to the gender bias of her male subordinate, Police Chief Craig Handschuch, contrary to the LAD.

The trial court granted summary judgment in favor of the Township of Livingston, and the Appellate Division affirmed. For the following reasons, we hold that sufficient evidence was present for a reasonable jury to find that what Councilmembers perceived to be Handschuch's discriminatory attitude toward Meade influenced the Council's decision to terminate her, in violation

2

of the LAD.  Accordingly, we reverse the grant of summary judgment and remand this matter for trial.

## I.

## A.

The summary judgment record reveals that Meade's employment as the Township Manager for Livingston began in July 2005 and ended in November 2016, when she was removed by the Township Council.  The Council cited a number of performance areas in the Resolution removing Meade; Meade contests the accuracy or implications of those and other comments in her response to defendant's statement of undisputed material facts.  She provides counter examples and further context for support.

A performance area central to this appeal was Meade's supervision of Police Chief Handschuch.

Meade testified in her deposition that she promoted Handschuch to the position of Chief of Police.  It is not clear from the record when Meade or the Council first began to note problems with Handschuch's performance, although a 2011 memorandum from Meade to Handschuch notes that the Chief was "seriously behind in completing scheduled work."  One particularly notable incident occurred during the school day on April 19, 2013.  The

incident was the subject of an independent investigation, and the report from that investigation reveals the following facts.

On the morning of April 19, pre-school teachers at the Livingston Community Center observed a man dressed in camouflage, carrying a rifle bag, in the building's parking lot. The teachers alerted their supervisor, who implemented lockdown procedures for the three pre-school classes then underway and called the Livingston Police Department (LPD).

The LPD immediately dispatched three patrol cars to the Community Center; at least two on-duty detectives who heard the call also made their way to the scene. The responding officers "[b]elieved they were responding to a situation potentially like the Newtown (CT) school shooting," and they "proceeded to the Community Center at speeds anywhere from 50 mph to in excess of 90 mph."

About two minutes after dispatch, Handschuch -- "on duty and overhearing the radio traffic" -- "alerted the responding units that the camouflaged man might be involved in training exercises being conducted by the Livingston Emergency Services Unit (ESU) on . . . a vacant dwelling . . . adjacent to the Community Center."[1] One minute later, after being contacted

_____

[1] According to the report, Handschuch authorized the ESU training in January 2013 and met with Hanna to review the logistics for the training the week before the training took place.

via cellphone, Sergeant Kenneth Hanna, who oversaw the ESU, informed responding officers that the camouflaged man was Officer Daly, a member of both the ESU and LPD who was participating in the ESU training exercise.

Following the identification of Officer Daly, the dispatched units returned to patrol. Chief Handschuch and Sergeant Hanna visited the pre-school classrooms to apologize for the incident, while the ESU continued their training. The law firm that conducted the independent investigation of the incident later concluded that Handschuch and the ESU were responsible; the investigator opined that the incident resulted from "a repeated failure to communicate the actions of the ESU to individuals and entities who needed the information."

It appears from the record that Meade went to the Community Center during or in the immediate aftermath of the ESU training incident. On May 2, 2013, Hanna signed a complaint-summons alleging that Meade had violated N.J.S.A. 2C:33-28 by using "unreasonably loud and offensive coarse or abusive language" in addressing him in a public place, including by asking him "what kind of f---ing operation are you running here."

On May 31, 2013, Meade emailed the investigation report to Chief Handschuch. Noting that the Township Council had -- "[b]y unanimous consent" -- directed her to take action, Meade in turn directed Handschuch "to

5

take any and all disciplinary action against Sgt. Hanna that you feel is appropriate in light of the report's findings."

That same day, Sergeant Hanna signed a second complaint-summons against Meade, alleging that she had "purposely com[e] into physical contact with officers and civilians in an attempt to obstruct and stop an authorized ESU training exercise in violation N.J.S.[A.] 2C:29-1." That second charge was decided after a two-day trial in April 2014,[2] along with a charge of simple assault brought against Meade pursuant to a citizen complaint dated April 22, 2013.[3] The Municipal Court of West Caldwell acquitted Meade of both charges in a 2014 decision.

Between the filing of Hanna's second complaint and the resolution of the charges against Meade, Meade sent a November 18, 2013 memorandum to Handschuch that began as follows:

> Due to the fact that you have failed to attend all of our scheduled monthly meetings in 2013 (there was no meeting scheduled in January and I had to cancel the September meeting) including February 26, March 25, April 23, May 28, June 25, July 23, August 27, and October 22, you leave me with no other option but to again send you a memorandum detailing your delinquent work and unresolved work issues.

[2] The State dismissed Hanna's offensive-language complaint prior to trial.

[3] The complainant, who had been present to photograph the training on behalf of the ESU, alleged that Meade had attempted to grab her camera and had brushed her shoulder and forearm in the process.

The memorandum discussed numerous areas of unsatisfactory performance and requested a full response. An email from Handschuch acknowledged receipt of the memorandum and noted that a response would be forthcoming, but the record suggests that no response was received. The following fall, a number of resident complaints came in about the conduct of a particular LPD officer and, in a memorandum to Handschuch about those complaints, Meade again requested materials that she had asked for in the November 2013 memo but never received.

Although it is not clear from the record what specifically prompted the remark, Councilmember Michael Silverman testified that he said, at a Democratic Executive Committee meeting held at his home in December 2014, that "Michele [Meade] would not be having this problem if her name was Michael." Six people were physically present at the meeting, including Councilmembers Alfred Anthony, Shawn Klein, and Rufino Fernandez, Jr.; Councilmember Edward Meinhardt and another person were on speakerphone.

Meade alleged in her complaint that the conflict between her and Handschuch escalated in 2015, when she expressed concerns about the Police Chief's job performance to the Council. Meade submits that Livingston's labor attorney had counseled her against taking action against Handschuch while the criminal charges related to the ESU training were pending against

7

her out of concern that Handschuch might then file a claim under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. Meade adds that, in late 2015, she endeavored to establish grounds for terminating the Chief's employment that would withstand challenge.

The complaint states that on June 30, 2015, Meade met with Councilmember and then-Mayor Silverman, as well as with the Deputy Mayor, the Human Resources Manager, and Livingston's labor counsel "to formulate a plan to address Handschuch's inadequate performance." Meade discussed the Chief's performance with attorney Jennifer Roselle, the "point person" from the law firm the Township of Livingston retained as counsel for labor and employment matters.

According to Roselle's deposition, Roselle found Meade's documentation regarding the Chief's performance likely sufficient to support disciplinary charges, but not termination. Roselle suggested to Meade that she should "try to strengthen a termination case" against the Chief and recommended an independent, outside investigation. Roselle also recommended that Meade ask the Council for its support in terminating the Chief, to have "a unified voice." When asked whether she had discussed with Meade "the effect the existence of [the] criminal case [against Meade] had on

8

[Meade's] ability to manage the department that brought that criminal case," Roselle responded that she did not remember.

By letter dated October 30, 2015, the Township Clerk advised Handschuch "that the Township Council anticipate[d] discussing personnel matters related to [the Chief's] employment at its next meeting, scheduled for November 2, 2015." By email, Handschuch informed the Clerk that he would be unable to attend that meeting. The next month, the Clerk sent Handschuch a similar letter advising him that matters relating to his employment would be discussed at the Council's December 21, 2015 meeting. Handschuch again responded that he would be unable to attend.

Shortly after receiving a forwarded copy of Handschuch's response, Silverman wrote an email to Meade:

> Unacceptable.
> He is to change his "prior commitments"
> This is his boss's bosses requiring his attendance.
> If he does not believe it important enough to show up
> then we should take the next steps.
>
> Michele, the ball is in your court. I would strongly recommend that you contact Jen Roselle and have a decision made today . . . . I (on behalf of the council) do not want to hear that you could not reach Jen or she is looking into it.
>
> Enough is enough. . . Bring him up on charges, bring in an investigator or do nothing. . . but the bottom line is he is YOUR employee and we (I) are (am) getting fed up with the garbage. . .

9

[(ellipses in original).]

Meade responded that she was similarly frustrated and added,

> [w]ith regard to next steps, the Council can hire an investigator and money can be placed in the 2016 budget for this. If the Council is in support of issuing charges, you know I am fully on board to do so. I can't do it alone as you well know. If the Council wants things to change here we have to do this as a team. This is the discussion we can have with the full Council on Monday night.

Silverman, copying the other members of the Council as well as Jennifer Roselle and the Township Attorney, responded, "Thank you," and asked the Clerk to "be sure that this is on the agenda [en]closed."

Despite such communications, however, Meade testified in her deposition that certain members of the Council "did not want to proceed with any adverse actions towards the chief" and that the Council did not authorize the hiring of "an outside investigator to conduct an investigation with an eye to potentially terminating the chief." Councilmember Shawn Klein explained that the Council's decision not to fund an independent investigation resulted from a fear that it "would cause things to drag on a lot longer" while being unlikely to uncover anything new. At the top of a list included in the summary judgment record and titled "Meade failures," Councilmember Shawn Klein noted that Meade "couldn't get rid of Chief; our new [Township Manager] did

10

it in a couple of months . . . and he did it based on infractions that the Chief committed while [Meade] was at her position."

In addition to noting the lack of financial support for the investigation, Meade filed a certification stating that, "[a]t or around the beginning of 2016, Councilman Al Anthony (who had become Mayor of defendant Livingston at that time) suggested to me that maybe Chief Handschuch did not like reporting to a woman and should report to him as the Mayor instead," a claim that Anthony disputed in his deposition.

In November 2016, after a 4-1 vote, the Township Council passed a Resolution removing Meade from her position.

Meade does not appear to dispute that the Township Council took the procedural steps necessary to terminate her public employment. In their respective statements regarding the material facts of the case, the parties agreed that "[t]here is no dispute that Meade received the 'Rice Notices,'[4] that her employment was discussed by the Township Council in an executive session, she was represented by counsel, [and] she was presented with the

---

[4] See Rice v. Union Cnty. Reg'l High Sch. Bd. of Educ., 155 N.J. Super. 64, 73 (App. Div. 1977) (holding that, for public employees to be able to exercise the right granted them by the Open Public Meetings Act to request a public hearing when their employment rights might be adversely affected, they must be given "reasonable advance notice so as to enable them to (1) make a decision on whether they desire a public discussion and (2) prepare and present an appropriate request in writing").

11

reasons the Township Council sought her termination"; Meade also received "the opportunity to present or provide a statement to the Council." The dispute, instead, centers on the reasons for Meade's removal.

The November 16, 2016 Council Resolution explains the decision to terminate Meade's employment for cause as follows:

> [t]he reasons for Ms. Meade's termination include her failure to timely keep the Council informed as to issues concerning the Township; her prioritization of budget items based upon her preferences rather than the preferences of the Council; her lack of responsiveness to Township residents; her failure to effectively pursue shared service agreements with other communities; and her failure to effectively manage the Township's employees[.[5]]

On the last point, Councilmember Klein testified to the following about Meade's difficulties in supervising Handschuch: Handschuch often failed to show up for work; that he picked favorites, leading to poor morale; that "there were tremendous problems with customer service"; that the Council asked Meade to ensure that the tint was removed from the windows of police cars, which "wasn't done"; and that the Council directed Meade to make sure the town's stray cat problem -- for which the Chief and his staff were responsible

---

[5] Similar notes were included in the Council's year-end review of Meade's performance as Township Manager for 2015, in which Meade received overall performance ratings by the five members of the Council of "Unsatisfactory" (two members), "Needs Improvement" (one member); "Fully Satisfactory (one member); and "Distinguished" (one member).

12

"because the animal control officer is a police officer or under the aegis of the policed department" -- but Meade "didn't take care of it, [and] the [C]hief didn't take care of it." In his list titled "Meade failures," Klein noted that Meade "[c]ouldn't fix Chief -- our copy of legal does show Chief's failures over and over but she could not get him to shape up -- that was her failure too." As noted above, Meade contests as false or misleading the reasons cited for her dismissal, including those related to her supervision of Handschuch, and argues that they were pretext.

After Meade's termination, Livingston used an outside headhunter to find a replacement, and there were women who applied for and were interviewed by Livingston for the Township Manager position. However, according to Councilmember Meinhardt, "[t]here [were] no qualified female employee[s] that were sufficient at that point . . . to make a job offer to." The town hired Gregory Bonin in 2017 and -- after Bonin's swift resignation, apparently to return to his former post, followed by a second search -- the town awarded the position to Barry Lewis. Chief Handschuch retired voluntarily after Lewis became Township Manager. Meade was the only female Township Manager in Livingston's history, and the only Township Manager to be involuntarily terminated.

13

B.

On January 31, 2017, Meade filed a complaint against Livingston asserting that she had been terminated based on her gender in violation of the LAD.[6]  Specifically, Meade alleged that the Council terminated her and replaced her with a male Township Manager "to appease the sexist male Police Chief."  Meade claimed that she suffered economic loss, emotional distress, harm to her career and reputation, and other compensable damages under the LAD as a result of the Council's unlawful conduct.

Livingston filed a motion for summary judgment, which the trial court granted on April 11, 2019.  In its decision, the trial court noted that "the only alleged discrimination -- this arguable discrimination comes from plaintiff's conflict with the Chief of Police."  The court stressed that "the Chief was subordinate to the plaintiff" and that "[p]laintiff and plaintiff alone had the authority to terminate the Chief of Police."  Rejecting "[p]laintiff['s] argument [that] the decision makers were explicitly aware that gender bias played a role in creating the situation that was causing them to consider Miss Meade's dismissal," the court found "no evidence of any pretextual behavior" and "no legitimate explanation regarding the grievances or commentary with regards to

---

[6]  Meade's complaint also named the four members of the Council who voted to terminate her employment, but her claims against them were dismissed with prejudice via consent order in October 2018.

14

her performance as Town Manager." The court concluded, "We have a situation where an employee was terminated because of poor work performance after [eleven] years of service in the position, [and] the record is devoid of any gender discrimination related to this termination."

Meade appealed, and the Appellate Division affirmed in an unpublished opinion. The Appellate Division found that Meade failed to discipline or correct the Chief's behavior and rejected her argument that "she was impeded by the Council in taking action against the Chief because the Council did not authorize an expenditure for an independent investigation of the Chief's performance." The court reasoned that "an outside investigation corroborating such shortcomings ultimately may have been helpful for defending, after the fact, a decision to remove or discipline the Chief"; it stressed, however, that "such an investigation was not mandatory. The Council had the discretion to not allocate public funds from the municipal budget for this purpose. Plaintiff already possessed the sole authority to discharge or discipline the Chief."

The appellate court also found that Meade's theory of liability under the LAD was "upside down," noting that Meade failed to allege that the Chief created a hostile work environment or that the Council failed to address such a situation. In the court's view, "any discrimination here came from below plaintiff, not above her. She had the authority to eliminate the problem

15

herself." The Appellate Division held that under the circumstances presented, "the trial judge appropriately found Meade's LAD claim unviable." Emphasizing the Township's "ample non-pretextual reasons that justified ending [Meade's] tenure as Township Manager," the court found that "[t]he Council did not engage in gender discrimination by letting her go."

We granted Meade's petition for certification. 245 N.J. 591 (2021). We also granted the National Employment Lawyer's Association of New Jersey (NELA) leave to appear as amicus curiae.

II.

A.

The parties and NELA make the following arguments regarding Livingston's liability under the LAD and whether summary judgment was improperly granted.

Meade argues that the trial court erred in distinguishing LAD case law on the basis that Handschuch was Meade's subordinate. Meade posits that "[t]he analysis . . . applies with equal force and logic where the actor that tainted the adverse employment decision with discriminatory animus was a subordinate of the plaintiff employee who was subjected to the adverse employment action." Meade asserts that the trial and appellate courts failed to address the substantial proofs offered to support her gender discrimination

16

claim and that a reasonable jury could find that the Council was influenced by Handschuch's discriminatory views when it decided to terminate Meade.

NELA, as amicus, echoes Meade's arguments that summary judgment was improperly granted. Additionally, both Meade and NELA urge this Court to adopt the cat's paw theory[7] of liability in finding Livingston liable.

Livingston posits that this is not a case for the Court to adopt the cat's paw theory of liability because Meade cannot show that Handschuch had the ability to, and did indeed, influence the Council in their decision to terminate Meade. Livingston contends that summary judgment was appropriate because Meade was terminated for her poor performance and failure to discipline Handschuch and argues that Meade failed to show that Livingston's reasons for her termination were pretextual.

III.

A.

Because the trial court dismissed Meade's claim on summary judgment, we review that decision de novo and apply the same standard that governs the

---

[7] The "cat's paw" theory of liability in the context of employment discrimination "refers to a situation in which a biased subordinate, who lacks decisionmaking power," uses the decisionmaker as a pawn to deliberately cause an adverse employment action against another. Marshall v. Rawlings Co. LLC, 854 F.3d 368, 377 (6th Cir. 2017) (quoting EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006)).

trial court. State v. Anderson, 248 N.J. 53, 67 (2021). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 450, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540). If "the evidence 'is so one-sided that one party must prevail as a matter of law,'" summary judgment is proper. Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). However,

18

summary judgment "is not meant 'to shut a deserving litigant from . . . trial.'" Friedman, 242 N.J. at 472 (quoting Brill, 142 N.J. at 540).

B.

Meade brought her claim against Livingston under the LAD. The LAD's goal is "nothing less than the eradication of the cancer of discrimination." Raspa v. Off. of Sheriff of Gloucester, 191 N.J. 323, 335 (2007) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)). The LAD prohibits discrimination and makes it unlawful

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, [or] disability . . . to refuse to hire or employ or to bar or to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .
>
> [N.J.S.A. 10:5-12(a) (emphasis added).]

"The law is thus intended to protect 'the civil rights of individual aggrieved employees' as well as 'the public's strong interest in a discrimination-free workplace.'" Rios, 247 N.J. at 9 (quoting Lehmann v. Toys 'R' Us, 132 N.J. 587, 600 (1993)). Therefore, "[t]he LAD is remedial legislation that should be liberally construed to advance its purposes." Id. at 10.

19

To analyze employment discrimination claims brought under the LAD, New Jersey has adopted the "procedural burden-shifting methodology" set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Zive v. Stanley Roberts, Inc., 182 N.J. 436, 4-47 (2005). Under that burden-shifting analysis,

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant must then show a legitimate nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [Henry v. Dep't of Hum. Servs., 204 N.J. 320, 331 (2010) (quoting Dixon v. Rutgers, 110 N.J. 432, 442 (1988)).]

It is thus the plaintiff who bears the burden to establish a prima facie discrimination claim. Victor v. State, 203 N.J. 383, 408 (2010). To establish a prima facie case of gender discrimination, a plaintiff must show that plaintiff: "(1) . . . was in [a] protected group; (2) . . . was performing [a] job at a level that met [the] employer's legitimate expectations; (3) [that plaintiff] nevertheless was fired; and (4) [that] the employer sought someone to perform the same work after [plaintiff] left." Zive, 182 N.J. at 450.

Significantly, "[t]he evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is

20

compatible with discriminatory intent -- i.e., that discrimination could be a reason for the employer's action.'" Id. at 447 (quoting Marzano v. Comput. Sci. Corp., 91 F.2d 497, 508 (3d Cir. 1996)). "[T]he prima facie case is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of defendants' efforts to dispute that evidence." Id. at 448. "All that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to the termination." Id. at 454. "That evidence can come from records documenting the plaintiff's longevity in the position at issue or from testimony from the plaintiff or others that she had, in fact, been working within the title from which she was terminated." Id. at 455. And when "the employer moves for a directed verdict based on the employee's failure to establish a prima facie case, the employee's evidence is also entitled to all legitimate inferences that derive therefrom." Zive, 182 N.J. at 448-49 (citing R. 4:37-2(b)).

Once the plaintiff makes that prima facie showing, the burden then shifts to the employer. See Henry, 204 N.J. at 331. Indeed, "[e]stablishment of a prima facie case gives rise to a presumption that the employer unlawfully discriminated against the employee." Bergen Com. Bank v. Sisler, 157 N.J. 188, 210 (1999). When the employer produces evidence of legitimate, non-discriminatory reasons for the employment action it took, the presumption of

unlawful discrimination disappears.  Id. at 211 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993)).

Finally, "[i]n the third stage of the burden-shifting scheme," the employee must "prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision." Id. at 449.

"Although the burden of production shifts throughout the process, the employee at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination." Sisler, 157 N.J. at 211 (citing Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 (1981)).  "In meeting that burden, the 'plaintiff need not prove that [gender] was the sole or exclusive consideration' in the [employer's termination decision]; rather, [plaintiff] need only show 'by a preponderance of the evidence that it made a difference' in that decision." Ibid. (quoting Murray v. Newark Hous. Auth., 311 N.J. Super. 163, 174 (Law Div. 1998)).

IV.

A.

Considering the facts of this case in the light most favorable to Meade as the party opposing this motion, Brill, 142 N.J. at 540, we conclude that summary judgment should not have been granted.

First, based on the evidence, Meade established a prima facie case of gender discrimination. See Zive, 182 N.J. at 449. As a woman, Meade is a member of a protected group; she performed her job as the Township Manager for eleven years, see id. at 455 (noting that longevity in a position can constitute evidence of job performance); and she was fired by Livingston and replaced with a male Township Manager. Under the McDonnell Douglas burden-shifting test, Livingston was then required to show legitimate, nondiscriminatory reasons for its decision to terminate Meade.

Livingston asserted that its decision to terminate Meade was rooted in her poor performance in a number of areas for which she was responsible, including but not limited to her failure to supervise or discipline the Chief. In response, to survive defendant's motion for summary judgment, Meade was then required to show sufficient evidence from which a reasonable jury could conclude that Livingston's asserted reasons for terminating her were mere pretext.

Under the circumstances, Meade has presented sufficient evidence to enable a reasonable jury to reach such a finding. Both Meade and Livingston agree that Meade's relationship with the Chief was untenable. Meade offered some evidence that two of the four Councilmembers who voted to terminate her had expressed the view that the Chief refused to accept a woman as his

23

supervisor and that one of them had shared that concern with the other members of the Council. Silverman acknowledged his view that the Chief took issue with reporting to a woman. Additionally, Councilmember Silverman told Councilmembers Anthony, Klein, Fernandez, and Meinhardt that "Michele [Meade] would not be having this problem if her name was Michael." Councilmember Anthony, who was the Mayor of Livingston at the time, also allegedly suggested to Meade that the Chief should report to him rather than to Meade because the Chief did not like reporting to a woman, an allegation he denied. Although the Councilmembers alleged a number of areas of dissatisfaction with Meade's performance, a reasonable jury could conclude -- in the combined light of Meade's evidence challenging the legitimacy of the other cited areas of dissatisfaction and the Council's own focus on the ongoing difficulties with Handschuch -- that Meade's gender played a role in the Council's termination of her employment, contrary to the LAD. A reasonable jury could conclude that the failure of the Council to authorize an investigation of the Chief fatally undermined Meade's ability to discipline the Chief, who had made clear to Councilmembers his gender-bias toward Meade.

We do not suggest that the intent or import of the alleged remarks by Silverman and Anthony -- or even the existence of the remark attributed to Anthony -- are beyond dispute. Shawn Klein, for example, testified that he

24

viewed Silverman's comment as a joke, that he did not think it was true, and that he did not "think [Silverman] thought it was true, either," adding that "[t]he chief also didn't listen to us. We were calling him for meetings and he wouldn't -- you know, we're a bunch of guys and the chief wouldn't listen to us, either, so he wouldn't listen to anyone." It is possible that a jury, upon weighing the evidence and making credibility determinations, may likewise find the remark unrelated to the Council's employment decision. But this is the summary judgment stage, and all conflicting inferences from the facts presented must be resolved in Meade's favor.

Meade was not expected to prove that gender was the "sole or exclusive" factor in her termination at this stage; rather she needed only to show "by a preponderance of the evidence that [her gender] made a difference" in that decision. Murray, 311 N.J. Super. at 174. A reasonable jury could determine that the Council fired Meade because it believed that she was unable to control the Chief as a result of her gender, in violation of the LAD. We offer no opinion on the outcome of the case or whether the Council's decision to terminate Meade was influenced by the Chief's discriminatory beliefs, only that Meade presented sufficient evidence to create a genuine issue of material fact sufficient for a trial on the merits.

25

B.

In reaching that determination, we take a different view of the importance of the Township Manager's statutory powers than the trial and appellate courts.

Under Livingston's Council-Manager form of government, the Township Manager is "the chief executive and administrative officer of the municipality," N.J.S.A. 40:69A-95(a), and has the power to "[a]ppoint and remove . . . all department heads and all other officers, subordinates, and assistants, except a municipal tax assessor," id. at (c), and to "[i]nvestigate at any time the affairs of any officer or department of the municipality," id. at (h). The Council, in turn, is required to "deal with the administrative service solely through the manager and shall not give orders to any subordinates of the manager, either publicly or privately." N.J.S.A. 40:69A-91.

In addition to the Manager's statutory powers, the Livingston Township Code specifies that the Township Manager has "the power and authority to reprimand, suspend, dismiss, deduct pay [from] or reduce in rank . . . any member of the Police Division for any violation of any of the rules and regulations," including those pertaining to "[w]illful disobedience of orders," "[a]bsence without leave" or "[r]efus[al] to perform any duty [or] evasion of any duty." See Livingston Township Code § 35-10(A)(2), (8), (24).

26

However, under N.J.S.A. 40A:14-147, a permanent member or officer of the police department, such as the police chief, can be removed only for cause, must receive written notice explaining the charges against him within a set amount of time, and is entitled to a hearing before the disciplining body to contest the charges against him.

The Appellate Division concluded that N.J.S.A. 40A:14-147's for-cause requirement had been satisfied by the record evidence of the Chief's "disobedience of rules and regulations established for the government of the police department and force." (emphasis removed). But Meade has presented testimony that the Township's labor counsel took a different view of the quantum of evidence that had been amassed in support of a potential employment action against Handschuch; that counsel recommended an independent investigation; and that the Council, while directing Meade to take action against the Chief and even to do so in consultation with the labor and employment attorney, declined to grant the funds necessary for that outside investigation. From that evidence, a reasonable jury could find that Livingston impeded Meade's efforts to terminate the Chief's employment.

The fact that the statutes and municipal code provisions that grant Meade the ability to discipline or terminate Township officers, including the Chief, confer that ability in absolute terms, without the contingency of an

27

investigation, is not dispositive. Counsel retained by Meade's employer advised Meade that the cause component was wanting, and a jury could reasonably find that Meade's hesitance to disregard counsel's advice and to fire the Chief without demonstrable cause was reasonable, given the risk of a potential legal challenge.

In sum, the trial and appellate courts focused primarily on the fact that a Township Manager has the legal ability to unilaterally fire the Township's Police Chief and did not consider evidence presented about counsel's advice in the light most favorable to Meade.

To the extent that Meade and the NELA urge this Court to adopt the cat's paw theory of liability, we decline to do so because this is not a cat's paw case.

The cat's paw theory of liability applies to "a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Marshall, 854 F.3d at 377 (quoting BCI Coca-Cola Bottling Co., 450 F.3d at 484). Meade is not alleging that a subordinate influenced her employer to fire her; rather, Meade is alleging that the Council's decision to fire Meade was influenced by the Chief's own allegedly discriminatory views. Our

28

previous decisions in Spencer v. Bristol-Meyers Squibb Co., 156 N.J. 455 (1998), and Battaglia v. United Parcel Serv., Inc., 214 N.J. 518 (2013), provide sufficient guidance in cases such as this.

In Spencer, this Court affirmed an employee's introduction of her supervisor's statement into evidence to show that an outside individual's racial animus influenced her employer's decision not to hire her. 156 N.J. at 456-58, 466. The employee brought suit against Bristol-Myers Squibb under the LAD, alleging she was denied a position as the Director of Marketing Research in Bristol-Myers Squibb's contemplated hospital marketing and marketing services department because of her race and age. Ibid. The employee alleged that she was denied the position because -- according to what the company's Director of Human Resources had allegedly told her -- a person who was "very influential in the company" had expressed concern that the plaintiff would be his daughter's supervisor if hired because he "would be a little concerned about the idea of having a black female of your age as her role model." Id. at 457-58. Our decision focused on the admissibility of the statement attributed to the director under the Rules of Evidence, see id. at 456, but it is significant for present purposes that we affirmed the admission of the statement, which was proffered to show that the outside individual's racial animus influenced Bristol-Myers Squibb's decision not to hire the employee, see id. at 466.

29

In Battaglia, we similarly determined that evidence of influence could support a CEPA claim. Battaglia involved an employee who was demoted after complaining about his supervisor's misuse of credit cards and inappropriate remarks about women in the workplace. 214 N.J. at 529-30. Following his complaint, the employee was reprimanded for poor performance, placed on paid leave, and demoted. Id. at 532-36. The employee brought a claim against his employer alleging that the employer violated CEPA and the LAD. Id. at 536.

The trial court ruled in favor of the employee, and the Appellate Division affirmed as to the CEPA claim but reversed on the LAD claim. Id. at 536-37. We reinstated the employee's LAD claim but reversed as to the CEPA claim "because of [a] significant error in the jury charge." Id. at 551, 561. In doing so, we stressed that a jury tasked with determining whether a plaintiff had established the necessary causal link between the employee's protected conduct and the employer's adverse employment action could find that the "employee had demonstrated the requisite causal link indirectly." Id. at 559. We explained "that proof that a supervisor who did not have the authority to subject the complaining employee to a retaliatory employment action but who prepared a biased evaluation because of the employee's CEPA-protected

30

complaints might have sufficiently tainted the view of the actual decision maker to support relief." Ibid.

Spencer and Battaglia reveal that unlawful employment discrimination -- whether based on gender or on the exercise of protected conduct -- can be predicated on claims that a non-decisionmaker's discriminatory views impermissibly influenced the decisionmaker to take an adverse employment action against an employee. In other words, actions taken to accommodate discriminatory views can support liability to the same extent as actions taken based on personally held discriminatory views. That same type of indirect action is alleged here, and the cat's paw theory is not implicated by this case.

## V.

For the reasons set forth above, we reverse the judgment of the Appellate Division and remand for further proceedings in accordance with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and PIERRE-LOUIS join in JUSTICE FERNANDEZ-VINA's opinion.

31